On the Merits, argued June 24, decided September 9, 1913.

## AMERICAN LIFE INS. CO. v. FERGUSON.

(134 Pac. 1029.)

### ON MOTION TO DISMISS.

**Injunction—Preliminary Injunction—Purpose and Effect.**

1. A preliminary injunction should not anticipate the ultimate determination of the question of right involved, but should merely recognize that a sufficient case had or had not been made to warrant the preservation of the property rights *in statu quo* until a hearing on the merits, without expressing a final opinion as to such rights.

**Appeal and Error—Orders Appealable—Order Affecting Substantial Right.**

2. Where a suit was in form for an injunction, but the relief asked for and that actually given was a peremptory mandatory injunction commanding defendant insurance commissioner to perform an official act that constituted the whole relief asked, the order was one affecting a substantial right, which in effect determined the suit, and was therefore appealable.

### ON THE MERITS.

**Action—Termination of Controversy.**

3. Where defendant insurance commissioner attempted to cancel complainant's license to do business in Oregon because of alleged impairment of capital, and complainant obtained an injunction restrain-

66 Or.—27

ing such cancellation, and on the expiration of the term of the license pending the suit, complainant prayed that defendant be restrained from refusing to issue a new license on the same ground, the subject of the controversy did not end with the termination of the original license, since it affected complainant's *status*, and not the license alone.

#### Corporations—"Capital"—"Capital Stock."

4. The capital of a corporation is the money furnished by subscribers or promoters to be used by the corporation in its business, or undertaking, while the "capital stock" is the authorized amount of the capital to be subscribed by the stockholders and to be contributed for the corporation's purposes; the "capital" being the amount contributed, while the stock subscription represents the amount agreed to be contributed. The subscribed capital stock represents the capital, and stands as a guaranty to the public of the corporation's ability to meet its obligations, and is not subject to disposal at the whim of the promoters or directors.

#### Insurance—Stock—Settlement.

5. Article XI, Section 3, of the Constitution, provides that stockholders of all corporations shall be liable for the indebtedness of the corporation to the amount of their stock subscribed and unpaid, and no more. Section 4610, L. O. L., provides that no insurance company thereafter organized shall assume any risk until it has a paid-up, unimpaired, cash capital of $100,000. *Held*, to prohibit any manipulation of the stock of an insurance company otherwise than for full value paid, and also to prohibit loans to stockholders operating to reduce or impair the company's capital below $100,000.

#### Insurance—Capital Stock—Payment—Assets—License to Do Business.

6. Where complainant insurance company did not claim that it had $100,000 capital stock subscribed, and paid in in cash, and only a very small portion of the stock subscription had been so paid, $35,000 or $45,000 worth being represented by notes and mortgages taken in exchange for stock, or for notes or property received as the price of stock sold, aside from the note and mortgage of a realty company which was in a similar situation, and it also appeared that various devices had been made to deceive the insurance commissioner and obtain the license required, the commissioner properly canceled the license, and it was error to compel him to issue a new one.

From Marion: WILLIAM GALLOWAY, Judge.

ON MOTION TO DISMISS.

This is a suit by the American Life & Accident Insurance Company against J. W. Ferguson, State Insurance Commissioner. There was a decree in favor of the plaintiff and defendant appeals. The facts are fully set forth in the opinion on motion to dismiss.

REVERSED: SUIT DISMISSED.

For appellant there was a brief over the names of *Mr. Andrew M. Crawford,* Attorney General, *Mr. Isaac H. Van Winkle* and *Mr. Merton R. DeLong,* Assistant Attorneys General, with oral arguments by *Mr. Van Winkle* and *Mr. Bert E. Haney.*

For respondent there was a brief over the names of *Mr. Lionel R. Webster, Mr. John A. Carson, Mr. John B. Cleland* and *Mr. Jay Bowerman,* with oral arguments by *Mr. Webster* and *Mr. Carson.*

MR. JUSTICE EAKIN delivered the opinion of the court.

In this case there were two appeals. The suit was first brought to enjoin defendant from canceling a license issued by him as Insurance Commissioner of Oregon, in January, 1912, for that year, authorizing plaintiff to do a general life and accident insurance business. At the trial in the Circuit Court defendant was enjoined as prayed, and defendant appealed. On January 2, 1913, before this appeal was disposed of, the former license having expired by its own terms, plaintiff filed a supplemental complaint in the same proceeding, reciting the pendency of the former cause and th᠆ expiration of the license, that the facts remai᠆ ᠆ the same, with the exception of some slight ch᠆᠆g᠆᠆ in the securities held, and that defendant had refused to issue to plaintiff a license for the year 1913, although formally petitioned for, and praying for a mandatory injunction restraining defendant from refusing to grant the license. On the same day the court upon this *ex parte* petition granted and issued an order to defendant enjoining him from refusing to issue the license, and reiterated the order in mandatory language, namely, directing and commanding him to forthwith issue to plaintiff a license permitting and author-

izing it to carry on the business of life and accident insurance for the year 1913 in Oregon, from which defendant appealed. These two appeals were argued and submitted together on January 17, 1913, and an opinion was written and handed down on February 4th, reversing the decrees and dismissing the case. On the suggestion of plaintiff that it did not submit the second appeal on the merits, but only on the motion to dismiss, the decision filed was withdrawn. On May 15th plaintiff filed a brief, and the case was reargued on June 24, 1913.

1. The first question presented is whether the order appealed from was an appealable one. Although the suit is in form for a petition for an injunction, yet the relief asked for and that actually given was a peremptory writ of *mandamus*. It commanded the defendant to perform the act that constituted the whole relief asked. The purpose and office of a preliminary injunction should in no manner anticipate the ultimate determination of the question of right involved. It should merely recognize that a sufficient case has been or has not been made to warrant the preservation of the property or rights *in statu quo* until the hearing on the merits, without expressing a final opinion as to such right: *Helm* v. *Gilroy,* 20 Or. 517 (26 Pac. 851).

2. And if the order affects a substantial right, and in effect determines the suit, it is appealable: *State* v. *Security Savings Co.,* 28 Or. 410 (43 Pac. 162); *State ex rel.* v. *O'Day,* 41 Or. 495 (69 Pac. 542). The order here gives plaintiff all the relief it asks, not simply holding the matter *in statu quo,* but putting plaintiff in a position to transact a general business, which the law forbids until certain conditions are complied with, and which defendant insists have not been complied with; and, notwithstanding the order is called an injunction, it is in fact a peremptory writ of *mandamus* and final. The motion to dismiss is denied.

## ON THE MERITS.

The second proceeding from which this appeal is taken is in fact, and was so considered by counsel for plaintiff and the court, an application in the first suit, accepting and relying upon the proceedings and decree in the first case as justifying the order in the second. As the order was made *ex parte* on the same day the application was filed, without notice to defendant or permitting him to be heard, the first decree was recognized as final and conclusive in the second proceeding. Plaintiff in its brief says that the principal question presented in each case is the same; that "the assets were practically and substantially the same in both instances." Therefore the merits of the first proceeding are involved in the second, and are before us.

The plaintiff was incorporated under the laws of Oregon on February 16, 1909, for the purpose, among other things, of doing a general life and accident insurance business. On the first day of the year of 1912 there had been issued to plaintiff a license to do an insurance business, and on May 20, 1912, said license was suspended by the Insurance Commissioner for the reason that the assets of the company were not such as are required by law, and that its capital was impaired. Thereupon plaintiff brought this suit to enjoin defendant from canceling its license. The complaint alleges that it has more than $100,000 paid-up, unimpaired, cash capital invested in and secured by first mortgages upon improved real estate in this state, the market value of which is at least double the amount of the mortgages thereon.

The answer, after denying most of the allegations of the complaint, alleges that plaintiff's capital is seriously impaired, and that it was not possessed of paid-up, unimpaired, cash capital equal to $100,000, and that what capital it had was not invested in the

class of securities required by law. The case was tried, and findings made to the effect that the company now has more than $100,000 paid-up, unimpaired capital, which is invested in and secured by first mortgages on improved unencumbered real estate in the state of double the value of the mortgages thereon, and the court rendered a decree enjoining defendant from revoking or in any way interfering with the license theretofore granted to plaintiff, and that the suspension of said license be set aside and annulled, from which defendant appeals to this court, and on January 2, 1913, issued a mandatory injunction requiring defendant to issue license for the year 1913 to plaintiff.

3. Both appeals were submitted together, and the consideration of the facts of the whole case are necessary to the decision of each appeal. The subject of the controversy did not end on December 31, 1912, but affected the *status* of plaintiff, and not the license alone: See *Livesley* v. *Johnston,* 45 Or. 33 (76 Pac. 13, 106 Am. St. Rep. 647, 65 L. R. A. 783); *Matter of Quinn,* 2 App. Div. 103 (37 N. Y. Supp. 534); *People ex rel. Spire* v. *General Committee,* 25 App. Div. 339 (49 N. Y. Supp. 723). The defendant is the state Insurance Commissioner, appointed under the statute of February 24, 1909, Laws of Oregon for 1909, page 389 (Section 4600, L. O. L.), creating the office and prescribing the duties of the commissioner. Among other duties he is required to see that all laws of this state respecting insurance companies are faithfully executed. By Section 4633, L. O. L., insurance companies are required, by the 1st of January of each year, to procure a license to do business in this state, and the commissioner must issue the license if he is satisfied that the company is qualified to do business under this statute. Section 4610, L. O. L., provides that "no such corporation hereafter organized shall be permitted to assume

any risk * * until such corporation shall have a paid-up unimpaired cash capital equal to $100,000 in United States gold coin.'' Section 4609 provides that no corporation shall be permitted to transact a life, fire or marine insurance business in this state without a certificate from the Insurance Commissioner authorizing and permitting the transaction of such business.

4. The capital of the corporation is the money furnished by subscribers or promoters of the corporation to be used by it in its business or undertaking. While the capital stock of the corporation is the authorized amount of the capital to be subscribed by the stockholders and to be contributed for the purposes of the corporation, the capital is the amount contributed, and the stock subscription represents the amount agreed to be contributed. The subscribed capital stock represents the capital, and stands as a guaranty to the public of its ability to meet its obligations, and is not subject to disposal at the whim of the promoters or directors.

In *Macbeth* v. *Banfield,* 45 Or. 553 (78 Pac. 693, 106 Am. St. Rep. 670), it is said that the stockholder's ''liability is to the full amount of the capital stock subscribed (by him). * * The obligation is to pay in money. * * It must be the equivalent of the par value of his stock, * * and it is a natural sequence that, if the stock liability is to be discharged in property, the property should measure up to a money value. Such is, no doubt, the plain intendment of the law; otherwise it might easily be so managed that stock subscribers would be virtually exonerated from their statutory liability by pretended and simulated agreements with the directors, and the corporation left without assets of material moment from the beginning, which would atrociously belie the representations made by the articles of incorporation touching the capital stock. Such is not the spirit of the law, nor has it been so where

there were no statutory regulations upon the subject, the common declaration being that the stock must be paid in money or money's worth—that is, what may fairly and justly be considered as money's worth."

5. In *McAllister* v. *American Hospital Assn.*, 62 Or. 530 (125 Pac. 286), it is said that the capital stock is presumed to represent the capital in business, a trust fund in that amount for the benefit of the creditors, and, as to them, the corporation has no authority to make any contract in the disposal of the stock that will reduce its capital, and persons subscribing for stock, or otherwise acquiring it from the corporation, are bound to take notice of this limitation upon the corporation. This is also the intent of Article XI, Section 3, of the Constitution, which provides that "the stockholders of all corporations and joint-stock companies shall be liable for the indebtedness of said corporation to the amount of their stock subscribed and unpaid, and no more." The law as thus stated aids us in understanding what the legislature meant by the clause of Section 4610, L. O. L., "nor until such corporation shall have a paid-up unimpaired cash capital equal to $100,000." Evidently this was meant to prohibit any manipulation of the stock otherwise than for full value paid, and loans to stockholders are prohibited: *Union Pac. Life Ins. Co.* v. *Ferguson,* 64 Or. 395 (129 Pac. 529). Thus stock transferred by the company for which the note of the purchaser is taken is not in compliance with the law. It does not constitute payment. It is intended thereby to prevent such transactions as the one covered by the contract with the American Bank & Trust Company, whereby it held control of the money nominally deposited in the name of plaintiff. This law is intended to remove from the stockholders or directors the temptation to so deal with the capital of the insurance company that it may disappear by

means of a book entry, or in any other manner than for real and full value, and also to remove from stockholders the opportunity or temptation to speculate with the company's assets, as a further guaranty to those dealing with the company. The Insurance Commissioner is given a wide discretion in safeguarding the interests of the present and prospective stockholders and policy-holders of the company. Common observations of a few cases occurring in Oregon as to the possibilities of such transactions evidence the wisdom of this provision in the law, and the need of diligence on the part of the commissioner; and it is not only within his province to scrutinize the internal workings of insurance corporations over which he is given supervision, but it is his duty under his oath and the obligation of his bond.

6. From the testimony it appears that the defendant does not pretend that the stock subscribed is paid up in cash. Two or three of the witnesses testify that D. J. McCallum subscribed for 1,000 shares and paid for it in full, but the payment meant is disclosed by the agreement of the plaintiff with the American Bank & Trust Company, of November 26, 1909, in which the bank agreed to loan to the company $40,000 on the company's note, secured by 400 shares of its capital stock, and issued in the name of McCallum, and also to loan $60,000 on four certain promissory notes, signed by certain individuals, most of them stockholders in the plaintiff, including McCallum and Moore, and 600 shares of the capital stock issued in the name of McCallum to be deposited as collateral therefor. The loans were to be made as follows: "All of the one hundred thousand dollars to be loaned by the bank as above provided shall be deposited in the bank to the credit of the company and that together with the eight thousand dollars deposited (by the company) shall re-

main on deposit to the credit of the company for one year from this date and the company shall not be permitted to withdraw directly or indirectly any of that money during that time. Although all the notes executed to the bank as above provided are made payable on demand, they are all to run for one year from this date, except as to some demand against the company which the bank would be compelled to pay out of this one hundred thousand dollars. * * The money to be obtained from the bank and deposited to the credit of the company as herein provided is so to be deposited and remain in the bank for the purpose of enabling the company to obtain license to carry on the business of insurance in this state, as provided in its articles of incorporation, and the bank through and by its proper officers is to furnish to the company such certificates or other evidence of the fact that there is deposited with the bank one hundred thousand dollars to the credit of the company and subject to its demand, that the same is not a 'time deposit' as may be required by the Insurance Commissioner of this state.'' This did not amount to a loan to McCallum, nor a payment to the plaintiff for the 1,000 shares of capital stock, nor was it a loan to the plaintiff, but was a mere device to fool the Insurance Commissioner, in order to enable the company to obtain the license. Thus the bank at the expiration of the year, could retain the money, cancel the notes, and return them as paid. L. O. Ralston, who was connected with the transactions of plaintiff and a stockholder therein, was the president of the bank, and signed this contract as such. It does not appear what became of this transaction. Undoubtedly the money was retained by the bank, and the stock and notes were surrendered to McCallum, and the plaintiff, as we find that McCallum and other agents of the plaintiff continued to sell stock on account of the plaintiff.

Seventy-eight shares of stock still remain in McCallum. However, there were 1,177 shares of stock held by McCallum sold, and the assets of the company at this time consist largely of notes and mortgages taken in payment for stock sold, of real estate taken in exchange for stock, and of a note of the Marietta Realty Company in the sum of $60,000, of the same character. The Marietta Realty Company is a corporation organized September 23, 1910, by L. O. Ralston, F. N. Myers and H. L. Ralston, with a capital stock of $5,000. All but one share of said stock was subscribed by L. O. Ralston and his wife. On the 23d day of October, 1910, there was deeded to it by L. O. Ralston and his wife a large amount of real estate for the expressed consideration of $10. On January 3, 1911, soon after the maturity of the notes given to the bank for $100,000, the realty company executed three notes in the aggregate sum of $100,000 to the plaintiff, due one year after date, each of which notes contains this clause: "And it is agreed and understood between myself and the payee thereof that neither this note nor the mortgage securing it shall be sold, assigned, transferred or pledged by the payee, except that it may be used or deposited with the Insurance Commissioner of Oregon for the purpose of procuring and maintaining a license and authority to carry on the business of insurance in this or other states, as provided in its articles of incorporation." This note is indorsed under date of January 3, 1912: "Interest paid to date. Payment of the within note is hereby extended for one year from date"—and is signed by the plaintiff. These notes were evidently a device of the same nature and for the same purpose as the loan from the bank, and were given in exchange for notes, mortgages and deeds to real estate held by the plaintiff and transferred to the realty company. About June 15, 1912, $40,000 was paid to the realty company from collections made by plaintiff's agents

on the choses in action, assigned by plaintiff to the realty company, and the old notes and mortgages were surrendered, and a new note and mortgage given on that date by the Marietta Realty Company to plaintiff in the sum of $60,000, which does not contain the clause above quoted from the earlier notes, and was in consideration for mortgages, notes and deeds to real estate and $3,000 in cash transferred to the realty company by the plaintiff.

It is very apparent from the evidence that but a very small amount of stock subscription has been paid in cash. $35,000 or $40,000 worth is represented by notes and mortgages, now exhibited as assets of the plaintiff, and were taken in exchange for stock or for notes or property received as the price of the stock sold, aside from the realty company note and mortgage, which is of the same class. Twenty-four hundred shares of stock were subscribed for and issued to McCallum originally. There is no pretense by plaintiff that more than 1,177 shares have been sold. It is shown that all of the sales of stock were made by agents of the plaintiff from the 2,400 shares originally issued to McCallum, and the conclusion is irresistible that the 2,400 shares were issued to McCallum without any payment. Zuhlsdorf, the auditor of the company, says McCallum has paid, for 1,000 shares, $100,000. When asked what he paid, he says he turned over $100,000, and we issued $100,000 worth of stock at par, with the understanding that all money he acquired above the par value, less expenses, he would turn back to the company. Evidently the witness is referring to the pretended loan from the bank to plaintiff on stock issued to McCallum and the notes of the stockholders; but, as we have seen, by this transaction the company got nothing but the bank's name to use with the Insurance Commissioner. There seems to have been no real sales of stock except those made to other persons than McCallum, and from stock issued

to McCallum.   These transactions, by which the company took notes and property in payment for stock, may have been fair between the company and the individual purchaser, but not fair to the policy-holders or creditors, nor to the stockholders.   Those purchasing stock or otherwise dealing with the company had a right to rely upon a compliance by the company with the law before it received its license, and upon the fact that it had a *bona fide* cash capital of $100,000.   By a similar device as was adopted when it secured an ostensible deposit at the bank in November, 1909, in January, 1911, a pretended obligation was obtained from the realty company upon which to obtain the license, and a fraud was perpetrated upon the public, especially affecting the people with whom it was dealing.   These notes and mortgages which were delivered to the realty company as consideration for the $60,000 note, now used as an asset of plaintiff for that amount, were taken from stockholders in payment for stock, and admittedly turned to the realty company because they would not be recognized by the Insurance Commissioner.   This transaction was not in compliance with the statute.   It was a device resorted to to avoid that objection of the commissioner.   L. O. Ralston is the principal stockholder in the realty company, and for the stock so held by him therein, for a nominal consideration expressed, he conveyed to it real estate of great value, and soon thereafter executed the notes mentioned to the amount of $100,000, paper that was in no sense commercial.   Ralston and his wife own 140 shares of stock in plaintiff.   We are not informed how they paid for it, nor that it is paid for.   The $60,000 note, although not containing the objectionable clause quoted from the first notes, was evidently executed and delivered for the same purpose, namely, of evading the statute and using it as an asset that would be recognized as such by the commissioner.   It was only an

exchange of choses in action, and, the stockholders and officers of the realty company being also stockholders of the plaintiff company, between whom there was a unity of purpose, the realty company's note could be easily manipulated to again leave the plaintiff with its own choses in action, and the realty company be relieved from liability.  The transaction does not bear on its face the appearance of an actual loan by the plaintiff to the realty company of its capital, or that the realty company's note is a liability which it expects to pay in cash at maturity.  At least the circumstances here shown warranted the Insurance Commissioner in making the investigation that he did, and in the rejection of that note as an investment of part of plaintiff's capital, if upon examination he deemed it a device to avoid the statute.  The commissioner has no right to connive at a simulated compliance with the statute. The law was intended to be a complete protection to the policy-holders in the corporation, as well as to stockholders.  Here are 180 stockholders in the plaintiff who undoubtedly became such upon the assurance given by the commissioner's certificate that they were investing in a corporation that already had $100,000 paid-up capital, and would not have put their money into it had they known the facts as to the manner in which the certificate was obtained.  We think the commissioner was justified in suspending the defendant's certificate theretofore issued, and would have been justified in canceling it if the plaintiff had neglected to comply with the law.

From these conclusions the final writ of injunction, of date September 3, 1912, and the second mandatory writ of injunction, of date January 2, 1913, are reversed, and the suit is dismissed.

REVERSED: SUIT DISMISSED.