Argued and submitted February 24, reversed and remanded September 6,
Glenbrook's and DEQ's petitions for review allowed December 19, 1995
(322 Or 420)

In the Matter of the Air Contaminant
Discharge Permit Application of
Glenbrook Nickel Company and

In the Matter of the NPDES
Permit Application of
Glenbrook Nickel Company.

LOCAL NO. 290,
PLUMBERS AND PIPEFITTERS,
and Certain Individual Members,
*Appellants,*

*v.*

OREGON DEPARTMENT OF
ENVIRONMENTAL QUALITY,
*Respondent,*

*and*

ENVIRONMENTAL QUALITY
COMMISSION OF OREGON,
*Defendant,*

*and*

GLENBROOK NICKEL CO.,
*Intervenor-Respondent.*

(9204-02467; CA A82407)

901 P2d 921

Linda K. Williams argued the cause and filed the brief for appellants.

John T. Bagg, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Lori Bauman argued the cause for intervenor-respondent. With her on the brief were Frank V. Langfitt III and Ater Wynne Hewitt Dodson & Skerritt.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

DEITS, P. J.

**DEITS, P. J.**

Petitioner, a local of a national labor organization,[1] sought circuit court review under ORS 183.484 of the Department of Environmental Quality's (DEQ) issuance of certain permits for a facility operated by respondent Glenbrook Nickel Co. (respondent). Petitioner contended, in general terms, that the orders granting the permits were contrary to federal and state environmental laws. The trial court granted DEQ's and respondent's motion for summary judgment, on the ground that petitioner did not have standing to seek judicial review of the agency actions. Petitioner seeks our review, and we reverse.

The trial court concluded that petitioner was not itself "adversely affected or aggrieved" by DEQ's orders, and therefore lacked direct standing under ORS 183.480 and ORS 183.484. *See also* ORS 468.110 (making Administrative Procedures Act (APA) review provisions applicable to proceedings of this kind). The court further concluded that petitioner did not have "representational" standing to challenge the permits on behalf of its present and retired members who reside in the vicinity of respondent's facility. Petitioner assigns error to both conclusions.

■ Petitioner's argument for direct standing is that it is adversely affected or aggrieved, because the pollution problems that will allegedly result from the issuance of the permits will have negative effects on the health of its members and on job opportunities, with resulting losses of union dues and to certain trusts that petitioner manages. DEQ answers that "the alleged loss is entirely dependent on a chain of unfortunate, even terrible, but highly speculative events." We agree. For petitioner to have direct standing, under circumstances of this kind, it must assert facts showing a direct injury to a substantial interest, or a "personal stake" in the agency action rising above an abstract interest in the proper application of the law. *People for Ethical Treatment v. Inst. Animal Care*, 312 Or 95, 817 P2d 1299 (1991). Petitioner's assertions simply do not meet that threshold. They are

---

[1] The putative "individual members," who are also designated in the caption, are nominal parties, if they are even that. We use the singular term "petitioner" in this opinion to refer to the local.

ephemeral and speculative. Petitioner is not adversely affected or aggrieved, and it does not have direct standing.

■ We turn to the representational standing question. That question is complicated by the fact that DEQ and respondent chose to proceed by summary judgment in this matter that was triable exclusively to the court. ORS 183.484(3). The effect of that strategy is that our review is to determine whether the trial court erred in concluding that there were no triable questions of fact. The trial court was not afforded an opportunity to make dispositive findings of fact. The summary judgment procedure is self-defeating in circumstances such as these: A trial judge who is prepared to say that there is *no* opposing evidence to even create a *question* of fact would almost necessarily *find* the fact in favor of the moving party, and a finding would generally be less susceptible to reversal on appeal than a determination that no question requiring a finding exists. Be that as it may, this is an appeal from a summary judgment, and we review it accordingly.

Although in a context other than an APA proceeding, the Supreme Court announced standards for representational standing in *Rendler v. Lincoln Co.*, 302 Or 177, 184-85, 728 P2d 21 (1986):

> "[T]he underlying questions are, first, whether the asserted collective interest is one that the members themselves could pursue and second, whether the organization is representing the position of its members on the disputed issues. To repeat, in this case the asserted collective interest is defined as a 'public' interest — a public easement — by the substantive law involved, so that only majority support of the membership for the organization's position could arguably become a matter of controversy; we do not deal with an organization's standing to represent the individual interests of some of its members, where the agreement or participation of those members might pose an additional question." (Footnote omitted.)

■ Respondent and DEQ first contend that the APA judicial review provisions should not be interpreted as allowing representational standing under any circumstances. They assert that, under ORS 183.480 and ORS 183.484, a "person," which may include an organization, must itself be

adversely affected or aggrieved to have standing. They maintain that, under the language of the statutes, an organization or entity can only be adversely affected or aggrieved if it is directly affected. Because direct effects cannot be experienced in a representative capacity, respondent and DEQ conclude that there can be no representational standing under the statute.

We do not believe that the pertinent statutes preclude representational standing in APA proceedings, or that the representative must be directly adversely affected or aggrieved to have standing in that capacity. Under the *Rendler* formulation, representational standing depends in part on whether the members or other represented persons would have been able to "pursue" the matter at issue independently of the representative. That would be a superfluous necessity if the representative was directly injured and, therefore, had standing independently of the members. If the represented persons are adversely affected or aggrieved, and if "the organization is representing [their] position * * * on the disputed issues," *id.* at 184, there is no logical reason why the organization itself must also meet the threshold of direct injury defined in the statute in order to have standing as a representative. Indeed, the way in which the concept is defined implies as much: "Representational standing" *is* a representative relationship, in which the represented persons must have the requisite interest in the subject in order for there to be anything for the representative to pursue on their behalf. Insofar as the argument of DEQ and respondent turns on the plain language of the statute, which does not expressly mention organizational or representational standing, neither does any other statute of which we are aware under which representational standing has been inferred by the courts.

We conclude that, in appropriate circumstances, representational standing is permitted in APA judicial review proceedings. We also conclude that the tests for whether the circumstances here are appropriate are those described in *Rendler*. Although the Supreme Court cautioned in that case, as it has in others, that standing depends on the terms of particular statutes rather than universal concepts, we find no basis for concluding that the very general tests for representational standing set out in *Rendler* should not be as applicable to the APA provisions as they are in the statutory context

that the court considered in *Rendler. See NW Alliance for Market Equality v. Tri-Met*, 85 Or App 26, 29 n 2, 735 P2d 1236 (1987) (admonitions against applying standing decisions under particular statutes to cases involving different statutes do not imply that there *can never* be *any* reciprocal relevance). Reduced to essentials, the inquiries in *Rendler* are whether the members or other represented persons can qualify for standing as individuals and, if so, whether the organization is authorized to represent or is in fact representing the members' positions. Those inquiries are equally pertinent to and dispositive of the representational standing question in this case.

We begin by concluding that respondent's and DEQ's showing in support of their summary judgment motions do not succeed in demonstrating the absence of a factual question as to whether petitioner has *any* members who could have standing as individuals here.

The next question is whether there was any evidence in the summary judgment proceeding that petitioner is representing the views of its members on the disputed issues. The principal evidence in the case was the discovery deposition of Matt Walters, petitioner's business manager, taken by respondent. During his deposition, as recounted at length below, Walters repeatedly asserted that certain documents either generally or specifically authorized the union's prosecution of this litigation.

The first relevant exchange in the deposition was the following:

"Q. [By respondent's attorney]: Do you have the constitution of the United Association?

"A: Yes.

"Q: I believe the question is, what parts of that constitution are you relying on for your understanding of — that you can go into this environmental permit examination and challenge the process?

"A: Well, I guess my answer is, the whole constitution and its individual parts. But if you want to go through each paragraph of it as it relates to the performance of my job and my duties as an officer of the local union and as a member of the United Association.

"Q:   Is there any section in that constitution that deals expressly with environmental permits, to your knowledge?

"A:   Not the words environmental permits. There are sections dealing with, generally speaking, with all of those reasons that I utilized earlier.

"Q:   Okay. Just give us some examples so we can see what you're referring to.

"A:   Okay. The first paragraph in the preamble: The aspirations of this association are to construct an organization which shall subserve the interest of all its members and be a fitting monument to the unions attached thereto. The objects of this association are to protect its members from unjust and injurious competition secured through unity of action among all workers of the industry throughout the United States and Canada, claiming as we do that labor is capital and is the only capital that possesses power to reproduce itself, or in other words, to create capital. Labor is the interest underlying all other interests. Therefore, it is entitled to and should receive from society government protection and encouragement.

"'* * * * *

"Q:   What part of that preamble relates to your activity of examining and perhaps challenging environmental permit applications?

"A:   The first part where it talks about an organization which shall subserve the interest of its members; the second paragraph, which talks about the objects of association are to protect its members from unjust and injurious competition."

The next relevant exchange was:

"Q:   Has the membership agreed, whether formally or informally, but has the membership of Local 290 agreed that there would be either some fraction of dues or some dollar or cents amount of dues that would be targeted toward the environmental permit involvement of Local 290?

"A:   Yes.

"Q:   Okay. Tell me, was it a formal agreement, or is it just an informal agreement by the membership?

"A:   Both.

"Q:   Are there any documents that relate to that?

"A:   There was a resolution passed by the membership establishing the — what is today the 40 cents which if I

remember right, talks about environmental processes. There was in addition to that the numerous discussions at each union meeting on the explanation of the expenditure of funds, which deal with the industry advancement, funding as it relates to environmental issues, and the approval each month of those expenditures."

At the time of the testimony, Walters did not have access to the resolution, and was relying on his memory of its contents. Later, the resolution was found in petitioner's files and produced. As we read the document, it does not say by expression or any reasonable implication what Walters recalled it to have said in his testimony. Similarly, *most* of the language in the constitution that Walters quoted in his deposition cannot reasonably be read to contemplate environmental involvement, or involvement in any matters unrelated to work and labor relations.[2]

We repeat, however, that it is a summary judgment we are reviewing. We cannot say, as a matter of law, that the term "subserve the interest of all its members" in the union constitution cannot mean what Walters testified he understood it to mean. In its context, the phrase is at least ambiguous as it bears on the standing question here. Conversely, there is nothing in the dues resolution discussed by Walters that *can* mean what he read it to say. However, Walters did not rely on the resolution alone in that connection, but also testified to the effect that he reported to the members that he was expending funds for environmentally-related activities, and that his reports were favorably received. That is evidence that can support an inference that the opposition to the permits in fact represented the members' views.

Whether petitioner's challenge to the permits "represent[s] the position of its members" is a question of fact. Petitioner's evidence in support of a negative answer fell short of being conclusive, and the trial court erred by allowing the motion for summary judgment.

Petitioner makes one further assignment, which does not warrant discussion.

Reversed and remanded.

---

[2] The problems are interpretive in nature, and we imply no lack of candor.