Argued and submitted August 13, 2008, affirmed April 1, 2009

OREGON EDUCATION ASSOCIATION,
an Oregon nonprofit corporation,
*Plaintiff-Respondent,*

*and*

STATE OF OREGON,
*Intervenor-Respondent,*

*v.*

OREGON TAXPAYERS UNITED PAC,
an Oregon political committee,
and Oregon Taxpayers United Education Foundation,
an Oregon nonprofit corporation,
*Defendants-Appellants,*

*and*

William SIZEMORE,
*Other-Appellant.*

Multnomah County Circuit Court
0012-12632; A126231 (Control)

AMERICAN FEDERATION OF TEACHERS,
OREGON, AFT, AFL-CIO,
an Oregon unincorporated association,
*Plaintiff-Respondent,*

*and*

STATE OF OREGON,
*Intervenor-Respondent,*

*v.*

OREGON TAXPAYERS UNITED PAC,
an Oregon political committee,
and Oregon Taxpayers United Education Foundation,
an Oregon nonprofit corporation,
*Defendants-Appellants,*

*and*

William SIZEMORE,
*Other-Appellant.*

Multnomah County Circuit Court
0108-08942; A126235

204 P3d 855

Gregory W. Byrne argued the cause and filed the briefs for appellants.

Gregory A. Hartman argued the cause for respondents Oregon Education Association and American Federation of Teachers, Oregon, AFT, AFL-CIO. With him on the brief were Michael J. Morris and Mark S. Toledo, General Counsel for Oregon Education Association.

Denise G. Fjordbeck, Senior Assistant Attorney General, argued the cause for respondent State of Oregon. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Robin Rojas McIntyre.

No appearance for respondent American Federation of Teachers, Oregon, AFT, AFL-CIO.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Schuman, Judge.

BREWER, C. J.

**BREWER, C. J.**

Defendants Oregon Taxpayers United PAC (OTU-PAC), Oregon Taxpayers United Education Foundation (OTU-EF), and William Sizemore appeal from an order holding them in contempt and awarding attorney fees to plaintiffs.[1] In the contempt order, the trial court determined that defendants had willfully violated an injunction that the court previously entered in the underlying case. We affirm.

The Supreme Court described the facts of the underlying case in *American Fed. Teachers v. Oregon Taxpayers United*, 345 Or 1, 189 P3d 9 (2008). We will discuss only those facts that are relevant to the contempt determination. OTU-PAC is a political action committee that primarily sponsors initiative petitions for the Oregon ballot. Until the trial court dissolved it, OTU-EF operated as a charitable organization that was exempt from taxes under 26 USC § 501(c)(3) and that was required to file reports with the state Attorney General as a charitable trust. On September 27, 2002, a jury entered a verdict awarding plaintiffs damages against both organizations for violations of the Oregon Racketeer Influenced and Corrupt Organization Act (ORICO), ORS 166.715 to 166.735. The factual foundation for the verdict consisted of the jury's findings that the defendant organizations had forged signatures to qualify two ballot measures for the 2000 general election, that OTU-PAC had filed false statements of its expenditures and contributions, and that OTU-EF had filed false reports with the state to conceal the fact that it had spent tax-exempt money to support OTU-PAC's political activities. The jury also found that those actions damaged plaintiffs and awarded them substantial damages, which the trial court trebled when it entered judgment. *See* ORS 166.725(7)(a).

Immediately after the verdict was entered, the trial court entered an order requiring OTU-PAC and OTU-EF to show cause why they should not be dissolved and, among other things, restraining them from "transferring, selling or

---

[1] Although Sizemore is not a defendant in the underlying case, he is the controlling party of both OTU-PAC and OTU-EF, and the trial court held him liable for their violations of the injunction. When the context requires, our references to "defendants" include Sizemore.

conveying any assets other than in the ordinary course of business" pending the show cause hearing. The court held the hearing on February 3, 2003. On April 30, 2003, it entered findings of fact, conclusions of law, and an injunction order (the injunction). On June 30, 2003, the court entered a money judgment and equitable decree (the judgment) that, among other adjudications, entered judgment on the jury's verdict and restated in their entirety the provisions of the injunction. Because this contempt proceeding is based on violations of the injunction, we will describe it in some detail.[2]

The injunction first recited the procedural background:

"This matter having come before the Court for a trial by jury on certain law issues between September 9, 2002 and September 27, 2002 and for a trial to the Court on certain equitable issues on February 3, 2003; the Court having received and considered all of the evidence and submissions of the parties in the trials as well as subsequent submissions, and the Court being fully advised in the premises * * *."

After that recital, the injunction took a number of actions. It dissolved OTU-EF and enjoined any successor organization, for a period of five years from the date of the judgment, from making contributions "or providing anything of value, including loans or in-kind contributions," to any political action committee. It defined a successor organization as one in which Sizemore is "a manager, officer, director, trustee, or controlling person * * * or otherwise participates, directly or indirectly, in the direction or control of the activities of the * * * organization." The injunction did not dissolve OTU-PAC, but it enjoined that organization and any successor political action committee, for five years from the date of the

---

[2] Although the contempt motion also alleged violations of the injunction as restated in the judgment, in its contempt order, the trial court purported to rely on the injunction, and it did not refer to the judgment. Defendants do not assert that the injunction was unenforceable because it was superseded by the judgment; they merely argue that the injunction was preliminary because it preceded the entry of a judgment into which it was incorporated. As explained below, because the injunction resolved the merits of its subject matter, it was not a preliminary injunction in the sense contemplated by ORCP 79 A. Accordingly, we do not further consider the effect of the judgment on the injunction.

judgment in the case, from receiving any contribution of anything of value from a tax-exempt organization. It again defined a successor political action committee as one in which Sizemore played a role. Finally, the injunction enjoined OTU-PAC, OTU-EF, and their successors from engaging in a number of illegal activities related to the misconduct in which they had previously engaged, specifically including enjoining OTU-EF from any violation of Oregon law in connection with reporting its activities on Attorney General's form CT-12. The injunction also enjoined both organizations from "transferring or destroying any of the assets, whether cash, personal property or real property, and including documents, computers, and computer hardware, software and files," until the judgment in the action is fully satisfied. The court entered extensive findings of fact and conclusions of law in support of the injunction. The injunction provided that it was effective immediately on its entry.

During the February 3, 2003, hearing that preceded the injunction, Sizemore testified that, after the jury's verdict, he formed a new political action committee, which eventually took the name Oregon Taxpayers Union (OTU2-PAC). Sizemore moved his operations, including both the old and the new organizations, to a new physical location but continued to use the same computers, furniture, and supplies that he had used for OTU-PAC and OTU-EF. He used those organizations' mailing lists to send a fundraising appeal in which he indicated that OTU2-PAC would continue OTU-PAC's activities. OTU2-PAC also adopted OTU-PAC's website and relied on its predecessor's accomplishments for fundraising purposes. The prohibition in the injunction against transferring assets of OTU-PAC and OTU-EF was designed, in part, to prevent the actions that Sizemore described in his testimony.

Following the entry of the injunction, Sizemore continued to use defendants' mailing list to solicit contributions for OTU2-PAC and to use defendants' computers and office equipment for OTU2-PAC's activities. The only exceptions were that he replaced the hard drives on the computers and put defendants' office furniture in storage. On July 7, 2003, plaintiffs filed a motion in which they alleged that Sizemore's activities violated the court's September 27, 2002, order and sought an order holding defendants in contempt.

Plaintiffs subsequently amended their contempt motion to add an allegation that OTU-EF had violated the April 30, 2003, injunction and the judgment by filing a false, misleading, and incomplete form CT-12 and that the use of defendants' computers and mailing list for OTU2-PAC constituted a transfer of those assets that violated that injunction's prohibition on transfers. In their response, defendants admitted that Sizemore had solicited donations to OTU2-PAC from persons on defendants' mailing list, that he had used their photocopier, telephone, mailing list, and office space to do so, and that OTU2-PAC had thereby raised $32,460.50. They also admitted that Sizemore had placed assets in storage and had replaced the computers' hard drives. Defendants denied that those actions violated the injunction and the judgment.

Before the show cause hearing on the contempt motion, the Attorney General, over defendants' objections, moved pursuant to ORS 166.725(5) to participate in the contempt proceeding.[3] The court held a three-day hearing on the contempt motion in May and June 2004. The testimony at the hearing was consistent both with plaintiffs' allegations and with defendants' admissions; Sizemore did not deny his actions but gave explanations for them. After the hearing, the trial court granted the Attorney General's motion to participate and denied the motion to hold defendants in contempt for violations of the September 27, 2002, order on the ground that any violations of that order were the subject of the February 3, 2003, bench trial and the April 30, 2003, injunction. In an order dated September 2, 2004, the court found defendants in contempt for violating the injunction and imposed sanctions against them. Finally, it awarded plaintiffs the attorney fees that they incurred as a result of the contempt, in an amount to be determined in accordance with ORCP 68. The court made a number of oral findings of fact as part of its decision.

After he entered the contempt order, Judge LaBarre, who had presided over the case until that point, recused himself from further participation. Judge Wilson, who replaced him, then held a hearing and awarded plaintiffs attorney fees in the amount of $125,000. Wilson did not make findings of

---

[3] The Attorney General had previously intervened in the underlying case.

her own but, instead, relied on the findings that LaBarre had made in holding defendants in contempt, although LeBarre had not expressly applied those findings to the attorney fee issue.

■■ We turn to defendants' assignments of error, beginning with those that challenge the validity of the injunction and plaintiffs' standing to move for a finding of contempt. If either of those assignments is well taken we must reverse the order of contempt in its entirety. We first consider defendants' fourth assignment, in which they argue that the injunction was a preliminary injunction that was unenforceable because plaintiffs failed to post the security that ORCP 82 A(1)(a) requires. That rule provides:

> "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs, damages, and attorney fees as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."

Without such security, a purported preliminary injunction is void, and a violation cannot be the basis for a finding of contempt. *See In re Tamblyn*, 298 Or 620, 625, 695 P2d 902 (1985); *Conifer Ridge Homeowners Assn. v. Hayworth*, 176 Or App 603, 607, 32 P3d 929 (2001); *Bruce v. Maurais*, 69 Or App 267, 270-71, 684 P2d 1243 (1984). Because the issue is jurisdictional, a party can raise it at any time; thus we must consider this assignment despite defendants' failure to preserve it before the trial court. *See Bruce*, 69 Or App at 270 n 3. Plaintiffs and the state make several arguments in response to this assignment; however, the decisive answer is that the injunction was not a preliminary injunction and, thus, plaintiffs were not required to post security in order for it to be effective.

■ The term "preliminary injunction" is not expressly defined in the Oregon Rules of Civil Procedure. However, ORCP 79 circumscribes the meaning of the term by setting out the circumstances under which a preliminary injunction may be granted. That rule provides, in part:

"A(1) **Circumstances.** Subject to the requirements of Rule 82 A(1), a temporary restraining order or preliminary injunction may be allowed under this rule:

"A(1)(a) When it appears that a party is entitled to relief demanded in a pleading, and such relief, or any part thereof, consists of restraining the commission or continuance of some act, the commission or continuance of which during the litigation would produce injury to the party seeking the relief; or

"A(1)(b) When it appears that the party against whom a judgment is sought is doing or threatens, or is about to do, or is procuring or suffering to be done, some act in violation of the rights of a party seeking judgment concerning the subject matter of the action, and tending to render the judgment ineffectual."

(Boldface in original.) In either of those circumstances, "[t]he office of a preliminary injunction is to preserve the status quo so that, upon the final hearing, full relief may be granted." *State ex rel. v. Mart,* 135 Or 603, 613, 295 P 459 (1931); *see also State ex rel McKinley Automotive v. Oldham,* 283 Or 511, 515 n 3, 584 P2d 741 (1978) (describing function of preliminary injunction as protection of status quo). Thus, a hearing on whether a preliminary injunction should issue is not a hearing on the merits, *see Fleming, Administrator, v. Woodward,* 180 Or 486, 488, 177 P2d 428 (1947), but is merely to determine whether the party seeking the injunction has made a sufficient showing to warrant the preservation of the status quo until the later hearing on the merits. *See American Life Ins. Co. v. Ferguson,* 66 Or 417, 420, 134 P 1029 (1913). Likewise, the purpose of a bond or other security is to protect the party enjoined from damages that occur because of the wrongful entry of the preliminary injunction. *See Kern et al. v. Gentner et al.,* 176 Or 479, 159 P2d 190 (1945) (discussing damages available on undertaking). Because a permanent injunction is based on a determination of the rights of the parties after a hearing on the merits, there is no basis for requiring the prevailing party to post security for a permanent injunction. *Id.* at 488.[4] The question, thus, is

---

[4] Some of the cases that we cite were decided before the adoption of ORCP 79 A and ORCP 82 A(1)(a). So far as we can determine, those rules adopted the pre-existing law in those respects, and those cases remain good law.

whether the injunction is a preliminary injunction intended to preserve the status quo or a permanent injunction based on a final determination of the merits. It is obvious from its face that it was intended to be a permanent injunction, not a preliminary injunction.

In the introductory recital, the injunction states that the court adopted it after trials to a jury and to the court, that the court had received and considered all of the evidence and the parties' submissions, and that the court was fully advised. In short, the injunction was based on a full review of the evidence and the parties' legal arguments. The specific terms of the injunction were designed to provide permanent redress for the misconduct that the court found; unlike the order of September 27, 2002, nothing about them has the purpose of simply preserving the status quo pending a hearing. Thus, the injunction dissolved OTU-EF, enjoined it and OTU-PAC for a period of five years from the entry of the judgment in the case from engaging in certain practices, required compliance with Oregon law in a number of respects, and applied not only to the organizations that were before the court, but also to all of their successors.

The only aspect of the injunction that might raise a question about whether it was a preliminary determination is the fact that the court issued it before entering the judgment in the case. In *Bruce*, we stated that the injunction at issue in that case was a preliminary injunction "because it was entered 'after the commencement of the action and before judgment.' ORCP 79 A(2)." 69 Or App at 270. Defendants read that statement as holding that ORCP 79 defines what constitutes a preliminary injunction and that any injunction entered before judgment is necessarily a preliminary injunction. However, in its full context that statement in ORCP 79 A(2) simply describes the time when a court may issue a preliminary injunction: "A temporary restraining order or preliminary injunction under this rule may be allowed by the court, or judge thereof, at any time after commencement of the action and before judgment." The rule does not describe what makes an order a preliminary injunction. The permissible grounds for the issuance of a preliminary injunction are set out in ORCP 79 A(1), and those grounds do not apply where, as here, the court made a determination on

the merits. The purpose of the orders at issue in *Bruce* was to preserve the property that was the subject of the action; they were preliminary injunctions under any definition of the term. To the extent that we suggested in *Bruce* that ORCP 79 A(2) means that any injunction that the court issues "before judgment" is necessarily a preliminary injunction, we overstated the effect of the rule. *Cf. Gritzbaugh Main Street Prop. v. Greyhound Lines*, 205 Or App 640, 646, 135 P3d 345 (2006), *rev den*, 342 Or 299 (2007) (describing as "permanent" injunction that trial court initially issued by order and later restated in general judgment).

In issuing the injunction, the court in this case acted under its authority in ORS 166.725(1) to issue "appropriate orders and judgments" in an ORICO case. Because the injunction was not a preliminary injunction, the security requirement of ORCP 82 A(1)(a) did not apply, and the injunction is not void.

In their second assignment of error, defendants assert that plaintiffs do not have standing to bring this action for contempt because they were not aggrieved by the alleged contempt. ORS 33.055(2)(a) provides that one of the persons who may bring a contempt proceeding is a "party aggrieved by an alleged contempt of court." Defendants argue that plaintiffs were not aggrieved because none of defendants' actions that allegedly violated the injunction harmed plaintiffs. Defendants take too narrow a view of what "aggrieved" means in this context.

The issue of plaintiffs' standing is a question of legislative intent. As the Supreme Court recently said in the context of administrative review:

> " 'Standing' is a legal term that identifies whether a party to a legal proceeding possesses a status or qualification necessary for the assertion, enforcement, or adjudication of legal rights or duties. *See Eckles v. State of Oregon*, 306 Or 380, 383, 760 P2d 846 (1988) (discussing principle). A party who seeks judicial review of a governmental action must establish that that party has standing to invoke judicial review. The source of law that determines that question is the statute that confers standing in the particular proceeding that the party has initiated, 'because standing is

not a matter of common law but is, instead, conferred by the legislature.' *Local No. 290 v. Dept. of Environ. Quality*, 323 Or 559, 566, 919 P2d 1168 (1996)."

*Kellas v. Dept. of Corrections*, 341 Or 471, 476-77, 145 P3d 139 (2006) (footnote omitted). Defendants rely on our statement in *Local No. 290 v. Dept. of Environ. Quality*, 136 Or App 213, 216, 901 P2d 921 (1995), *rev'd on other grounds*, 323 Or 559, 919 P2d 1168 (1996), for determining who is aggrieved by a decision. In *Local No. 290*, we held that, in order to be sufficiently aggrieved to be able to seek review of an administrative decision, a party "must assert facts showing a direct injury to a substantial interest, or a 'personal stake' in the agency action rising above an abstract interest in the proper application of the law." *Id.* In that case, we held that the petitioners did not have such an interest because the agency action could affect them only by a highly speculative chain of events. Although the legislature has not defined "aggrieved" for purposes of ORS 33.055, the term is one of legal art when used in connection with judicial review of a final order; it is designed to ensure that "concrete adverseness" exists in the proceeding and that a tribunal's orders are not enforced by "mere bystanders." *See Richards v. Board of Parole*, 339 Or 176, 182, 118 P3d 261 (2005) (applying definition of aggrievement used in *Local No. 290*). In the absence of a different expression of intent, we presume that the legislature intended that meaning in prescribing the statutory standing requirement for contempt proceedings. Under that standard, plaintiffs had standing to bring this contempt proceeding.

ORS 33.055(3) provides that the person seeking to hold another in contempt shall file the motion "in the proceeding to which the contempt is related, if there is a related proceeding." In this case, plaintiffs filed the contempt motion in the underlying ORICO action, to which the contempt was related. Thus, in order to determine if plaintiffs are aggrieved by the alleged contempt, we first examine that case and the basis for the injunction that defendants allegedly violated.

In the conclusions of law that the trial court entered at the same time as the injunction, it concluded that plaintiffs had proved their ORICO claims against defendants and

were entitled to equitable relief. Among other things, the court concluded that the

> "actions of OTU-PAC and OTU-EF and their agents constitute racketeering activity under ORS 166.715(6)(B) and a pattern of racketeering within the meaning of ORS 166.715(4). The actions of the defendants and their agents * * * were in furtherance of the enterprise. The defendants and their agents participated, directly or indirectly, in the enterprise through a pattern of racketeering activity in violation of ORS 166.720(3).

> "Defendants and Bill Sizemore have been and are engaging in the violations described herein as a continuing course of conduct. Without the requested equitable relief under ORS 166.725(1), there is a probability that defendants will continue to engage in a pattern of racketeering within the meaning of ORS 166.715(4). Injunctive relief is necessary to prevent continuation of this conduct which is probable and which threatens continued injury to the public interest.

> "* * * * *

> "The balance of hardships weighs in favor of granting the requested equitable relief in that protection of the public and the plaintiffs against further racketeering by defendants and their successors outweighs the burden placed upon defendants and successor organizations by their being subject to an injunction."

(Paragraph numbers omitted.)

Thus, one of the purposes of the injunction was to provide a remedy for defendants' previous racketeering activity and to protect plaintiffs from harm from defendants' continued racketeering. Any violation of the injunction affects the achievement of that purpose and places plaintiffs at risk of a repetition of the conduct that led the court to enter the injunction. The conduct that is the basis for plaintiffs' motion is in part defendants' refusal to take responsibility for their past actions (filing a false form CT-12) and in part defendants' attempt to create a new entity that can carry on defendants' activities without being responsible for the judgment against defendants (using defendants' mailing list and other assets to support OTU2-PAC). Because plaintiffs alleged that defendants have violated an injunction the purpose of which

was to protect plaintiffs from a continuation of conduct that has harmed them, plaintiffs have a personal stake in the proceeding beyond their interest as members of the public. They are aggrieved by any violation of the injunction and have standing to bring this contempt action. Because of that conclusion, we need not consider plaintiffs' argument that the mere fact that they obtained the injunction was in itself sufficient to show that they were aggrieved by a violation.[5]

■ In their first assignment of error, defendants assert that the trial court erred in finding that they transferred assets to OTU2-PAC when they allowed it to use their office equipment and mailing list. They rely on *State ex rel Roberts v. Far West Federal Bank*, 100 Or App 231, 234, 785 P2d 798, *rev den*, 309 Or 645 (1990), in which we quoted what we described as the ordinary legal definition of "transfer":

> " 'The sale and every other method, direct or indirect, of disposing of or parting with property or with an interest therein, or with the possession thereof, or of fixing a lien upon property or upon an interest therein, absolutely or conditionally, voluntarily or involuntarily, by or without judicial proceedings, as a conveyance, sale, payment, pledge, mortgage, lien, encumbrance, gift, security or otherwise.' *Black's Law Dictionary* (5th ed) 1342 (1979)."

Defendants assert that, under that and other definitions, a transfer requires a change of ownership or, at least, a relinquishment of possession to another, something that, they argue, did not happen in this case. '

The difficulty with defendants' argument is that, as the trial court noted, their actions met the definition of "transfer" for which they argue. Defendants permitted OTU2-PAC to use their office equipment (other than the computer hard drives), their website, and their mailing list in order to conduct its business. OTU2-PAC could not have used any of that property without having possession of it. Whether

---

[5] In their third assignment of error, defendants assert that the trial court erred by granting the state's motion to participate in the contempt proceeding. Their sole supporting argument is that there was no valid contempt proceeding for the state to join because plaintiffs did not have standing to bring it. We reject the third assignment for the same reasons that we reject the second.

that possession was temporary or permanent, for the purposes of the injunction it constituted a transfer.

In their arguments, defendants appear to assume that the sole purpose for the prohibition on transferring assets was to ensure that the assets were available for execution on the judgment. They fail to recognize that a significant purpose of the injunction was to prevent defendants, including Sizemore, from resuming the racketeering enterprise that had damaged plaintiffs. That purpose was at least as important as making defendants' assets available so that plaintiffs could execute on them once the court entered the final judgment in the case. Part of preventing Sizemore from resuming his former enterprise was to prevent him from using defendants' assets in operating any successor organizations. When Sizemore used defendants' office equipment and, more importantly, their website and mailing list in order to raise funds for OTU2-PAC, he violated those purposes as well as the precise terms of the injunction.

Even under defendants' limited view of the injunction, OTU2-PAC's use of the website and mailing list constituted a violation. By permitting that use, defendants attempted to use their assets to raise money that would flow to another organization and, thus, would not be available to pay the judgment against them. The court recognized that fact when it included in the order of contempt a requirement that OTU2-PAC pay the full amount that it had raised from OTU-PAC's donors through the use of OTU-PAC's mailing list to OTU-PAC, thereby making it available for paying OTU-PAC's obligations under the judgment.

■ In their fifth assignment of error, defendants argue that there is no evidence to support the trial court's holding that OTU-EF violated Oregon law in filing its 2001 form CT-12 with the Attorney General. As the trial court noted, form CT-12 incorporates IRS form 990. The trial court found that Sizemore filed the required forms without signing them and that those forms failed to report substantial in-kind contributions from OTU-EF to OTU-PAC's lobbying activities. Those contributions included paying all of Sizemore's health and life insurance and the fire and liability insurance on the

joint office that both organizations used. In addition, OTU-EF had a secretary and paid her full salary and benefits. OTU-PAC officially had no secretarial help. However, OTU-EF's secretary performed substantial secretarial duties for OTU-PAC, thus making in-kind contributions to it. Neither form CT-12 nor IRS form 990 showed those contributions.

Defendants do not challenge those facts. Rather, they argue that the facts do not show a violation of the requirement in the injunction that defendants comply with Oregon law in their filings. Because form CT-12 requires that a charitable organization attach a copy of its federal tax return, particularly IRS form 990 and supporting schedules, to form CT-12, the trial court correctly concluded that the federal return is a part of the filing with the Attorney general. Thus, any misrepresentation on the federal form is as much a violation of state law as a misrepresentation on form CT-12 itself. [6] Because the court did not impose custodial sanctions, we review to determine whether a reasonable trier of fact could find that there was clear and convincing evidence to support the trial court's findings, not, as defendants argue, whether there is evidence to support a conclusion that the findings were true beyond a reasonable doubt. *See* ORS 33.055(11).

■ Defendants first challenge the trial court's determination that Sizemore's failure to sign the 2001 form CT-12 violated the injunction. Rather than sign the form and thus assert, under penalties of perjury, that to the best of his knowledge and belief it was true, correct, and complete, Sizemore had his accountant state on the signature line that OTU-EF was dissolved and had no remaining officers. The trial court could find that the evidence was clear and convincing that that action was a willful failure to file a complete report. The dissolution of the organization did not excuse Sizemore, as the controlling officer in 2001, from signing the return. OAR 137-010-0015 provides that, when a charitable trust is terminated or dissolved, "a final report shall be filed with the Attorney General showing the disposition of all remaining assets." A charitable trust can file a final report, of

---

[6] Because the trial court concluded that form CT-12 incorporated IRS form 990, its findings regarding form CT-12 necessarily refer to both forms.

course, only after its dissolution. Without some person to certify the accuracy of the report, there can be no effective filing. Thus, the rule implicitly requires a former officer of the dissolved or terminated charitable trust to sign the report on its behalf. The same rule applies to a report of a dissolved charitable trust that is not its final report. There was no justification for Sizemore's failure to sign the 2001 form CT-12.

Defendants next challenge the trial court's finding that they failed to report the insurance payments and secretarial salaries as in-kind contributions. They argue that the forms did not require OTU-EF to list in-kind contributions. However, IRS form 990 required OTU-EF to list separately the amount of cash and noncash grants. It did not list amounts for either kind of grant. The court could conclude that the failure to list in-kind contributions as noncash grants was a failure to file a truthful form. In addition, defendants do not challenge the trial court's finding that OTU-EF gave OTU-PAC and its subsidiary PACs $83,450 in cash contributions in the fiscal year 2001 but did not report those contributions on its 2001 form CT-12. There was sufficient evidence for the trial court to conclude that Sizemore violated the injunction with regard to filing the form CT-12. The court also could find that Sizemore knew what he was doing and did not act inadvertently. That is sufficient for it to conclude that his actions were willful, a determination that does not require a finding of malice on Sizemore's part. *See Young v. State of Oregon*, 340 Or 401, 409, 133 P3d 915 (2006) (holding that the word "willful" under ORS 652.150 merely indicates that the act or omission was purposeful and not the product of inadvertence); *Sabin v. Willamette-Western Corp.*, 276 Or 1083, 1093, 557 P2d 1344 (1976) (same, relying on a case that described the definition as applying to civil cases generally).

In their sixth assignment of error, defendants argue that the court's order requiring OTU2-PAC to pay defendants the amounts that it raised by using defendants' equipment and mailing lists is an invalid forfeiture rather than a remedial sanction. Defendants point out that ORS 33.105(2)(b) provides for forfeiture only as a punitive sanction. The problem with defendants' argument is that the requirement is not a forfeiture to plaintiffs or the state. ORS 33.105(1)(f) authorizes the court to impose a remedial sanction in addition to

those that the statute otherwise lists "if the court determines that the sanction would be an effective remedy for the contempt." The court could properly determine that requiring OTU2-PAC to pay money that it raised by using defendants' assets to defendants is an appropriate sanction. In doing so, the court merely recognized that the money was, in essence, defendants' from the beginning. The order simply made that asset as available as defendants' other assets to pay the judgment in favor of plaintiffs.

 In their seventh and eighth assignments of error, defendants challenge the trial court's decision to award attorney fees to plaintiffs and the amount of the award.[7] They first assert that there is no statutory authority to award attorney fees to plaintiffs. However, ORS 33.105(1)(e) authorizes the trial court in a contempt action to order "[p]ayment of all or part of any attorney fees incurred by a party as the result of a contempt of court." In *St. Sauver and St. Sauver*, 196 Or App 175, 189, 100 P3d 1076 (2004), we stated that the statute entitles the prevailing party in a contempt action in a dissolution proceeding to recover attorney fees. Defendants argue that that statement was *dictum*, apparently because we cited another statute as also authorizing an award of fees. Whether or not defendants are correct as to the precise effect of our statement, it correctly describes the effect of ORS 33.105(1)(e) in all contempt actions and we therefore adhere to it.

Defendants next argue that the actions that were the basis for the finding of contempt did not cause plaintiffs to incur any attorney fees. Defendants take too narrow a view of the statute, which authorizes the award of fees incurred "as the result of a contempt." An action to hold the contemnor in contempt and to impose appropriate sanctions is a result of a contempt; without that action, the contempt would go unpunished and the party aggrieved by the contempt would not receive any redress. Thus, the fees that plaintiffs incurred in bringing this contempt action were a result of the contempt, and the court could award those fees to plaintiffs.

---

[7] Defendants also argue that they, not plaintiffs, are entitled to attorney fees. Because we hold for plaintiffs on the merits, we do not need to discuss defendants' arguments.

Defendants also point out that LaBarre did not make findings of fact that expressly applied to the attorney fee issues. When he found defendants in contempt, he made oral findings of fact and stated that he would award attorney fees. However, he recused himself shortly afterwards, and Wilson made the actual award of attorney fees. At the hearing on attorney fees, defendants argued that Wilson had to make her own findings before she could award any fees. Wilson rejected that argument and, instead, examined LaBarre's oral findings and identified those that, she believed, were the basis for his decision to award fees. She concluded that those findings satisfied the requirements of ORS 20.075(1). That procedure was an appropriate response to the change of judges. It was not necessary for Wilson to redo the work that LeBarre had done; she could properly determine that his oral findings provided the basis for his action. Such a use of oral findings was consistent with the statute. *See State ex rel Dept. of Human Services v. J. N.*, 225 Or App 139, 144-45, 200 P3d 615 (2009) (stating that, in context of unpreserved error, it is at least arguable that, with one exception, trial court's written judgment, oral findings, and reference to incorporation of evidence in the record satisfied statute requiring findings). Defendants do not argue that the findings that Wilson identified are insufficient to support the decision to award attorney fees or the amount of the award.

Finally, defendants argue that the court's award of $125,000 in attorney fees was excessive for what they describe as a simple and straightforward proceeding. So far as we have been able to determine, nothing in this case has been simple and straightforward. Given the record before it, including the affidavit of plaintiffs' attorney, we cannot say that the trial court acted outside its discretion in determining the amount of the award.

Affirmed.