Submitted on the briefs June 3; peremptory writ of mandamus to issue immediately, in terms consistent with this opinion June 12, 2020

ELKHORN BAPTIST CHURCH,
an Oregon nonprofit corporation;
Calvary Chapel Newberg,
an Oregon nonprofit corporation;
Calvary Chapel Lincoln City,
an Oregon nonprofit corporation;
Calvary Chapel Southeast Portland,
an Oregon nonprofit corporation;
New Horizon Christian Fellowship,
an Oregon nonprofit corporation;
Camas Valley Christian Fellowship,
an Oregon nonprofit corporation;
Peoples Church, an Oregon nonprofit corporation;
Prepare the Way, an Oregon nonprofit corporation;
Bend Community Church, an Oregon nonprofit corporation;
Covenant Grace Church, an Oregon nonprofit corporation;
Jedidiah McCampbell, an individual;
Ronald Ochs, an individual;
Brian Nicholson, an individual;
James B. Thwing, an individual;
Mark Russell, an individual;
Phil Magnan, an individual;
Ronald W. Rust, an individual;
Travis Hunt, an individual;
Mason Goodknight, an individual;
Mark Mayberry, an individual;
Lori Mayberry, an individual;
Benjamin Steers, an individual;
Michael Carroll, an individual;
Kevin J. Smith, an individual;
Polly Johnson, an individual;
Benjamin Boyd, an individual;
Annette Lathrop, an individual;
Andrew S. Atansoff, an individual;
Sherry L. Atansoff, an individual;
Micah Agnew, an individual; and
Angela Eckhardt, an individual,
*Plaintiffs-Adverse Parties,*

*and*

RED ROCK COWBOY CHURCH,
an Oregon nonprofit corporation, et al.,
*Plaintiffs,*

*and*

Bill HARVEY,
Sam Palmer, Glenn Palmer, Jerry Shaw,
Matthew R. Cunningham, Donald A. Jay, Jacoe A. Brown,
Samuel N. Brown, Virginia Stegemiller, B. David Hurley,
and Douglas W. Hills,
*Intervenors-Adverse Parties,*

*v.*

Katherine BROWN,
Governor of the State of Oregon,
and Does 1 through 50,
*Defendants-Relators.*

(CC 20CV17482) (SC S067736)

466 P3d 30

Plaintiffs filed an action in Baker County Circuit Court seeking declaratory and injunctive relief with respect to the Governor's executive orders declaring a state of emergency based on the coronavirus pandemic and imposing various restrictions pursuant to that state of emergency. They also moved for issuance of a preliminary injunction enjoining enforcement of the orders while the case was being litigated. The circuit court granted the preliminary injunction, finding that plaintiffs ultimately would prevail on their theory that the executive orders had expired under, or violated, durational limitations on the Governor's authority to respond to public health emergencies under ORS 433.441 to 433.452. The Governor filed a petition in the Oregon Supreme Court for a writ of mandamus directing the circuit court to vacate the preliminary injunction or show cause why it had not done so. The Governor argued that, while the executive orders referred to powers described in ORS 433.441, the state of emergency had been declared under ORS 401.165, and states of emergency declared under that statute are not time limited but persist until terminated by the Governor or by joint resolution of the legislature. The court issued an alternative writ of mandamus and, when the circuit court declined to vacate the preliminary injunction, accepted arguments from the parties about whether the preliminary injunction should stand. *Held*: The preliminary injunction must be vacated because the circuit court's decision to issue it was based on an erroneous proposition—that, although the Governor had declared the state of emergency under the broad provisions of ORS 401.165, her invocation of the powers specified in ORS 433.441 to 433.452 caused the state of emergency and orders issued thereunder to be subject to the time limitations that apply to states of emergency declared under ORS 433.441 to 433.451.

Peremptory writ of mandamus to issue immediately, in terms consistent with this opinion.

Original proceeding in mandamus.*

Ray D. Hacke, Pacific Justice Institute, Salem, filed the brief for plaintiffs-adverse parties.

Kevin L. Mannix, Salem, filed the brief for intervenors-adverse parties.

Benjamin Gutman, Solicitor General, Salem, filed the brief for defendants-relators. Also on the brief was Ellen F. Rosenblum, Attorney General.

Aruna A Masih, Bennett Hartman, Attorneys at Law, LLP, Portland, filed the brief on behalf of *amicus curiae* Oregon Nurses Association. Also on the brief was Thomas K. Doyle, General Counsel, Oregon Nurses Association, Tualatin.

Luke D. Miller, Military Disability Lawyer, LLC, Salem, filed the brief on behalf of *amicus curiae* New Civil Liberties Alliance.

Paul Janzen, Janzen Legal Services, LLC, Beaverton, filed the brief on behalf of *amicus curiae* Kelly Barnett.

Before Balmer, Nakamoto, Flynn, Duncan, Nelson, and Garrett, Justices.**

PER CURIAM

Peremptory writ of mandamus to issue immediately, in terms consistent with this opinion.

Garrett, J., concurred in the judgment and filed an opinion, in which Balmer, J., joined.

_____

    *   On petition for peremptory or alternative writ of mandamus from an order of the Baker County Circuit Court, Matthew B. Shirtcliff, Judge.

    **  Walters, C.J., did not participate in the consideration or decision of this case.

## PER CURIAM

This case comes to this court during a pandemic. As we all know, a novel coronavirus was first detected in late 2019, and it has spread rapidly across the globe, killing hundreds of thousands of people. Even more people have fallen ill, and healthcare systems in cities around the world have been overwhelmed, including in the United States. As the virus has spread, government leaders have taken actions to protect people in their jurisdictions from illness and death. They have done so in constantly changing circumstances, and they have responded to new information about the virus and its effects as it has become available. In this state, as in others, the Governor has issued executive orders to respond to the threat posed by the virus and the illness it causes, COVID-19. Because the virus spreads through close personal contact and through the air, some of the orders have restricted the size of gatherings and required that people maintain specified distances between themselves and others. Relatedly, other orders have closed schools and businesses. The restrictions have had substantial consequences for individuals and entire economies. It is unknown how long those consequences will last, just as it is unknown how long it will be before there is a cure or vaccine for COVID-19.

There have been and will continue to be debates about how best to respond to the threat posed by the coronavirus. Those debates include debates about what balance the government should strike between protecting lives and protecting liberties. To the extent that those debates concern policy choices, they are properly for policymakers. That is, those difficult choices must be made by the people's representatives in the legislative and executive branches of the government. As the United States Supreme Court stated more than a century ago, "It is no part of the function of a court *** to determine which of two modes is likely to be the most effective for the protection of the public against disease." *Jacobson v. Massachusetts*, 197 US 11, 30, 25 S Ct 358, 49 L Ed 643 (1905). Chief Justice Roberts reiterated that point less than a month ago, when he stated that "'the safety and health of the people'" is principally entrusted to the states' political leaders. *South Bay United Pentecostal Church v. Newsom*, No 19A1044, 590 US ___, 140 S Ct 1613,

207 L Ed 2d 154, 2020 WL 2813056 at *1 (May 29, 2020)
(Roberts, C. J., concurring) (quoting *Jacobson*, 197 US at 38).

Of course, in our system of government, with its
three separate branches structured to check and balance
the powers of each other, the courts do have a role to play.
That role is to determine whether the other branches have
exceeded the legal limits on their authority. As the Supreme
Court also stated in *Jacobson*, courts have the authority to
intervene when political leaders attempting to protect the
public against an epidemic act in "an arbitrary, unreason-
able manner" or in a way that goes "far beyond what [is]
reasonably necessary." 197 US at 28. But, as Chief Justice
Roberts recently observed, when political leaders "'under-
take[] to act in areas fraught with medical and scientific
uncertainties,' their latitude 'must be especially broad.'"
*South Bay United Pentecostal Church*, 2020 WL 2813056 at
*1, (Roberts, C.J., concurring) (quoting *Marshall v. United
States*, 414 US 417, 427, 94 S Ct 700, 38 L Ed 2d 618 (1974)).
"That is especially true where *** a party seeks emergency
relief in an interlocutory posture, while local officials are
actively shaping their response to changing facts on the
ground." 2020 WL 2813056 at *2.

It is within that broader context—a global pandemic
caused by a new and rapidly spreading virus, during which
conditions change on a daily basis and significant restric-
tions have been imposed and caused economic harm—that
this case comes to us. However, as in all cases, it is import-
ant to focus on the particular issue presented. And, in this
particular case, at this particular time, the issue presented
is narrow.

This case is a mandamus proceeding. It arises out
of a civil action filed in Baker County Circuit Court. That
action is still pending in the circuit court. In it, plaintiffs,
Elkhorn Baptist Church and several other churches and
individual churchgoers, challenge the executive orders
that the Governor has issued in response to the corona-
virus pandemic. Because a plaintiff's pleadings frame
the issues before a court, it is necessary to be clear about
what plaintiffs have alleged in their complaint. As detailed
in our discussion below, 366 Or at 521, plaintiffs' claim is

that the Governor's orders have expired by operation of law.

In the underlying civil action, plaintiffs asked the circuit court for a preliminary injunction. A preliminary injunction is an extraordinary remedy. It is an order that is issued while a case is still being litigated. Here, plaintiffs asked the circuit court to enjoin the enforcement of the Governor's orders while their civil action is pending. They based their request on their claim that the orders have expired by operation of law. Among other things, they argued that the orders violated a statutory time limit.

The circuit court issued the requested preliminary injunction. It did so based on its conclusion that, as plaintiffs argued, the duration of the orders had exceeded a statutory time limit.

The Governor then filed a petition for a writ of mandamus, asking this court to vacate the preliminary injunction. In a mandamus proceeding, this court will order a circuit court to vacate a preliminary injunction if the circuit court based the preliminary injunction on a "fundamental legal error" or acted "outside the permissible range" of its discretion. *State ex rel Keisling v. Norblad*, 317 Or 615, 623, 860 P2d 241 (1993). Thus, the particular issue in this case is whether the circuit court erred in taking the extraordinary action of issuing a preliminary injunction.

For the reasons explained below, the circuit court erred in concluding that the Governor's executive orders violated a statutory time limit as plaintiffs had argued. The circuit court's statutory analysis cannot be reconciled with the statutory text and context, and is directly at odds with how the legislature intended the statute to apply. The Governor issued the orders pursuant to ORS chapter 401, which authorizes the Governor to declare a state of emergency that continues until it is terminated either by the Governor or the Legislative Assembly. The orders are not subject to the statutory time limit on which plaintiffs relied, which is set out in ORS chapter 433. Because the circuit court's conclusion about the statutory time limit was fundamental to its issuance of the preliminary injunction, it is necessary to vacate the preliminary injunction.

## I.   HISTORICAL AND PROCEDURAL FACTS

### A.   *The Executive Orders*

In response to the pandemic, Governor Brown has issued 21 executive orders. In the orders, the Governor has exercised emergency powers granted by the legislature through statutes. The Governor issued her first executive order related to the coronavirus pandemic, Executive Order (EO) 20-03, on March 8, 2020. As mentioned, the coronavirus was first detected in late 2019. In early 2020, the virus spread and caused outbreaks in Europe and the Middle East. Some of the first known cases in the United States were identified in January 2020 in Washington state, Oregon's neighbor to the north. EO 20-03 describes the circumstances that existed at that time. It states:

> "As of March 8, 2020, there are 14 presumptive or confirmed coronavirus cases in Oregon, 430 cases in the United States, and 101,927 cases worldwide, in a total of 94 countries. In the United States, there have been 19 deaths, and worldwide there have been 3,468 deaths. On January 30, 2020, the International Health Regulations Emergency Committee of the World Health Organization declared the outbreak a 'public health emergency of international concern.' On January 31, 2020, the Secretary of the U.S. Department of Human Services declared a public health emergency for the United States. Two counties in Oregon and several states also have declared states of emergency in response to the coronavirus outbreak, including California and Washington."

The Governor issued EO 20-03 pursuant to ORS 401.165. The order begins:

> "ORS 401.165 *et seq.* empowers the Governor to declare a state of emergency upon determining that an emergency has occurred or is imminent. Pursuant to that authority, I find that the novel infectious coronavirus has created a threat to public health and safety, and constitutes a statewide emergency under ORS 401.025(1)."

ORS 401.165(1) provides that the Governor "may declare a state of emergency by proclamation * * * after determining that an emergency has occurred or is imminent." For the purposes of ORS 401.165, "'[e]mergency' means a

human created or natural event or circumstance that causes or threatens widespread loss of life, injury to person or property, human suffering or financial loss, including but not limited to * * * disease." ORS 401.025(1).

As discussed in greater detail below, 366 Or at 527-31, the declaration of a state of emergency pursuant to ORS 401.165 gives the Governor the authority to exercise certain powers and to take certain actions. The powers include, but are not limited to, "all police powers vested in the state by the Oregon Constitution in order to effectuate the purposes of [chapter 401]." ORS 401.168(1); *see also* ORS 401.168 - 401.198 (setting out additional powers). In addition, if the Governor declares a state of emergency pursuant to ORS 401.165, the Governor may implement any action authorized by certain statutes in ORS chapter 433 relating to public health emergencies, specifically, ORS 433.441 to 433.452. ORS 433.441(4).

A state of emergency declared pursuant to ORS 401.165 is not limited to a specific number of days. ORS 401.192(4) provides, "The powers granted to the Governor by ORS 401.165 to 401.236 shall continue until termination of the state of emergency." ORS 401.204(1) provides that "[t]he Governor shall terminate the state of emergency by proclamation when the emergency no longer exists, or when the threat of an emergency has passed." In addition, ORS 401.204(2) provides that the state of emergency "may be terminated at any time by a joint resolution of the Legislative Assembly."

EO 20-03 includes specific directions and orders to state agencies. Among other things, it states that the Oregon Health Authority and the state Public Health Director "shall take all actions necessary and authorized under ORS 401.651 to 401.670, ORS 433.443, and ORS 431A.015" to respond to the emergency. EO 20-03 concludes by stating that the declared state of emergency "shall exist for sixty days" from the date of the order, "unless extended or terminated earlier by the Governor." Thus, EO 20-03 was due to expire on May 7, 2020. On May 1, 2020, it was extended to July 6, 2020, by EO 20-24.

As the coronavirus spread across the country, the Governor issued additional executive orders. The threat posed by the virus was met with increasingly restrictive actions to protect the health and lives of Oregonians. On March 12, 2020, the Governor issued EO 20-05, which prohibited "large social, spiritual, and recreational gatherings of 250 people or more." That order provided that the gatherings

> "include, but are not limited to, community, civic, public, leisure, faith-based, and sporting events, concerts, conventions, fundraisers, and any similar events or activities, if a distance of at least three (3) feet between individuals cannot be maintained."

On March 17, 2020, the Governor issued EO 20-07, which reduced the number of persons permitted at such gatherings to 25. EO 20-07 also prohibited the consumption of food and drink at restaurants and other similar establishments. Subsequent executive orders closed schools, required the postponement of elective and non-urgent medical procedures in order to conserve personal protective equipment, and imposed a temporary moratorium on residential evictions for non-payment of rent. *See* EO 20-08 (closing schools); EO 20-09 (suspending in-person instruction at higher education institutions); EO 20-10 (preserving personal protective equipment); EO 20-11 (imposing temporary moratorium on residential evictions).

On March 23, 2020, the Governor issued EO 20-12, designated as the "Stay Home, Save Lives" order. Among other things, EO 20-12 requires "social distancing" at non-essential social and recreational gatherings. It provides:

> "Non-essential social and recreational gatherings of individuals outside of a home or place of residence (e.g., parties, celebrations, or other similar gatherings and events) are prohibited immediately, regardless of size, if a distance of at least six feet between individuals cannot be maintained."

In addition to requiring social distancing at non-essential social and recreational gatherings, EO 20-12 orders the closure of certain businesses and imposes social distancing requirements on others.

Since the Governor issued EO 20-03, the coronavirus has continued to spread. The number of deaths in this country has grown from 19 on March 8, 2020, to more than 110,000, on June 8, 2020. *See* Johns Hopkins University, *COVID-19 Dashboard*, https://coronavirus.jhu.edu/map.html (accessed June 8, 2020). Worldwide, the number of deaths grew from 3,486 to more than 403,300 during that same period. *Id*.

The spread of the coronavirus has not been uniform. It has affected some areas more than others. In Oregon, 159 people have died from COVID-19 as of June 8, 2020. That number, while tragic, is relatively low. As plaintiffs themselves acknowledge, the Governor may deserve "a colossal amount of credit for keeping the death toll so low."

However, the restrictions imposed by the Governor's executive orders have had an undeniable cost. Businesses have been shuttered and jobs have been lost. Oregon's unemployment rate rose from 3.5 percent in March 2020, to 14.2 percent in April 2020.[1]

Some of the Governor's executive orders address the economic ramifications of the restrictions imposed by other orders. As mentioned, one executive order imposes a temporary moratorium on residential evictions. EO 20-11. Another imposes a temporary moratorium on the termination of certain rental agreements. EO 20-13. A third protects federal relief payments from garnishment so that the payments can be used for essential needs. EO 20-18.

As recounted above, the restrictions imposed in the executive orders have changed over time in response to changing circumstances. Previously, they were tightened; now, they are being loosened. On May 14, 2020, the Governor issued EO 20-25, to begin the process of reopening the state. That order established a three-phase process for reducing restrictions on a county-by-county basis. On June 5, 2020, the Governor issued EO 20-27, which further defines the phased reopening process and rescinds and

---

[1] State of Oregon Employment Department, *COVID-19 Leads to Oregon's Record Job Losses in April*, at https://www.qualityinfo.org/documents/10182/73818/Employment+in+Oregon?version=1.80 (accessed June 10, 2020).

replaces EO 20-25. The process set out in EO 20-27 allows counties to move from phase to phase as they meet requirements related to their capacities to limit the spread of the coronavirus and care for those who fall seriously ill because of it.

B.   *The Underlying Civil Action*

In the civil action that underlies this mandamus proceeding, plaintiffs filed a complaint, naming Governor Brown and other officials as defendants.[2] Because a plaintiff's complaint frames the issues before a court, it is important to be clear about the claims that plaintiffs make in their complaint.[3] Plaintiffs request two forms of relief: declaratory relief and injunctive relief. *See* ORS 28.010 (authorizing declaratory judgment actions); ORS 28.020 (providing for declaratory judgments regarding statutory and constitutional rights); ORS 28.080 (providing for further relief based on a declaratory judgment, if necessary or proper). Their requests for relief are based on a specific legal theory: that the Governor's executive orders violate time limits.

Plaintiffs acknowledge that, in her first executive order regarding the coronavirus pandemic, the Governor declared a state of emergency pursuant to ORS 401.165, described above. Nevertheless, plaintiffs base their time-limit claim on provisions that, by their terms, relate to other types of declarations. Specifically, they rely on provisions in ORS chapter 433, which relate to declarations of public health emergencies, and provisions in Article X-A of the Oregon Constitution, which relate to declarations of catastrophic disasters.

---

[2] Plaintiffs' complaint states that they have not yet identified the other officials, who, they allege, are "legally responsible for the events and happenings" referred to in the complaint. Plaintiffs name the other officials as "Does" and state that they will amend the complaint to identify them once their "names and capacities" are ascertained. *See* ORCP 20 H ("When a party is ignorant of the name of an opposing party and so alleges in a pleading, the opposing party may be designated by any name, and when such party's true name is discovered, the process and all pleadings and proceedings in the action may be amended by substituting the true name.").

[3] Plaintiffs amended their original complaint. The operative complaint is their second amended complaint. All references to plaintiffs' complaint in this opinion are to that complaint.

ORS 433.441(1) provides that, "[u]pon the occurrence of a public health emergency, the Governor may declare a state of public health emergency as authorized by ORS 433.441 to 433.452 to protect the public health." To do so, the Governor must issue a "proclamation" that identifies, among other things, the nature of the public health emergency and the political subdivision or geographic area subject to the proclamation. ORS 433.441(2). "A proclamation of a state of public health emergency expires when terminated by a declaration of the Governor or no more than 14 days after the date the public health emergency is proclaimed unless the Governor expressly extends the proclamation for an additional 14-day period." ORS 433.441(5). Thus, a proclamation of a public health emergency expires no later than 28 days from the day it is proclaimed.

Article X-A of the Oregon Constitution concerns "catastrophic disasters" and provides that "the Governor may invoke the provisions of this Article if the Governor finds and declares that a catastrophic disaster has occurred." Or Const, Art X-A, § 1(3). The declaration of a catastrophic disaster gives the Governor and the legislature extraordinary powers; it overrides more than 10 other provisions of the state constitution, including provisions that impose requirements for spending money and passing bills. *Id*. §§ 1-5. If the Governor declares a catastrophic disaster, the provisions that grant the extraordinary powers "shall cease to be operative not later than 30 days following the date the Governor invoked [the provisions]," unless the legislature extends their operation. *Id*. § 6(1), (2).

Relying on the 28-day maximum time limit in ORS 433.441(5) and the 30-day time limit in Article X-A, section 6(1), plaintiffs' complaint asks the circuit court for six declarations, each of which relates to their time-limit claims.[4]

---

[4] In their complaint, plaintiffs ask the circuit court to make the following declarations:

- EO 20-03—the Governor's initial executive order, which provides that the state of emergency "shall exist for 60 days, *** unless extended or terminated earlier by the Governor"—expired 30 days after it issued by operation of Article X-A, § 6(1);

- The 60-day duration of EO 20-03 violates ORS 433.441(5) and Article X-A, § 6(1);

Accordingly, in their prayer for relief at the conclusion of their complaint, plaintiffs ask the court to declare that all the Governor's executive orders issued in response to the coronavirus pandemic "have expired by operation of law."[5]

After plaintiffs filed their complaint, a group of individuals, including local government officials, business owners, and churchgoers, filed a motion to intervene in the case, and the circuit court granted the motion. Intervenors filed their own complaint, in which they included their own statement of facts, but adopted all the other sections of plaintiffs' complaint.

Plaintiffs sought a preliminary injunction to enjoin enforcement of the Governor's executive orders while their civil action is pending.[6] ORCP 79 governs preliminary injunctions, and it provides, in part, that a court may issue a preliminary injunction

> "[w]hen it appears that a party is entitled to relief demanded in a pleading, and such relief, or any part thereof, consists of restraining the commission or continuance of some act, the commission or continuance of which during the litigation would produce injury to the party seeking the relief[.]"

ORCP 79 A(1)(a). When determining whether to issue a preliminary injunction, courts consider, among other things, the likelihood that the party requesting the injunction will

---

- EO 20-24, which extended EO 20-03 for 60 days, "is facially unconstitutional" because it violates the durational limitation in Article X-A;

- All the orders issued in furtherance of EO 20-03 "are invalid, having terminated by operation of law or being unconstitutional";

- EO 20-12 is unconstitutional because it "allows [the] Governor to impinge constitutionally protected rights as long as she sees fit—even after [the] duration of the state of emergency set forth in [the Governor's] own orders has terminated"; and

- Plaintiffs are free to resume holding and attending religious gatherings.

[5] Plaintiffs' complaint refers to only 19 of the Governor's 21 executive orders issued in response to the coronavirus to date. EO 20-25 had not been issued when plaintiffs filed their complaint. It was issued on May 14, 2020, the day the circuit court held a hearing on plaintiffs' motion for a preliminary injunction. The parties alerted the court to EO 20-25, and the court included it in the preliminary injunction. EO 20-27, which replaces EO 20-25, was issued on June 5, 2020.

[6] The day after filing their complaint, plaintiffs filed a motion for a temporary restraining order. The circuit court and the parties have since treated the motion as one for a preliminary injunction.

ultimately prevail on the merits of its claim and whether, if the injunction is not issued, the party will be irreparably harmed during the litigation of the claim. *State ex rel. v. Mart*, 135 Or 603, 613, 283 P 459 (1931); *City of Portland v. Baker*, 8 Or 356, 365 (1880). Courts also balance the harm to the movant against harm to the opposing party and the public if the injunction is issued. *State ex rel. v. Duncan*, 191 Or 475, 500, 230 P2d 773 (1951); *Booth-Kelly Lumber Co. v. Eugene*, 67 Or 381, 384, 136 P 29 (1913).

Plaintiffs filed a memorandum in support of their request for a preliminary injunction. Regarding their entitlement to relief, plaintiffs again asserted that the Governor's executive orders violated the time limits in ORS 433.441(5) and Article X-A, section 6(1). In keeping with that argument, plaintiffs asked the circuit court to issue "a preliminary injunction prohibiting [the] Governor from enforcing any and all orders issued in response to the pandemic." (Capitalization modified.)

Regarding the harm that they would suffer if the circuit court did not issue the preliminary injunction, plaintiffs asserted that the Governor's executive orders interfered with their ability to practice their religion. In connection with that assertion, they cited Article I, sections 2, 3, and 26, of the Oregon Constitution, which protect the rights to worship, freely exercise religious opinions, and assemble.[7]

It bears emphasizing that all the declarations that plaintiffs request in their complaint are based on their time-limit claims and that, when arguing for the preliminary injunction, plaintiffs argued that they were likely to succeed on those claims. Plaintiffs have not requested any declaration relating to whether the executive orders violate their constitutional rights to freely exercise their religion

---

[7]  Article I, section 2, provides, "All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences." Article I, section 3, provides, "No law shall in any case whatever control the free exercise, and enjoyment of religeous [*sic*] opinions, or interfere with the rights of conscience." Article I, section 26, provides, "No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good; nor from instructing their Representatives; nor from applying to the Legislature for redress of greviances [*sic*]."

or assemble,[8] and they sought a preliminary injunction
to enjoin the enforcement of *all* the orders, not only those
that could affect their ability to practice their religion. As
recounted above, the orders cover a range of subjects. Some
concern medical responses to the pandemic; others concern
economic issues, such as evictions and garnishments of
relief funds.

     The Governor objected to plaintiffs' motion for a
preliminary injunction, contending that the executive
orders were issued pursuant to ORS 401.165 and were not
subject to the time limits in ORS 433.441(5) and Article
X-A, section 6(1). The Governor also contended that the rele-
vant facts weighed overwhelmingly against interfering with
the state's ongoing efforts to slow the spread of the corona-
virus; she asserted that enjoining enforcement of the orders
"would pose a public health risk and create an unreasonable
risk of exacerbating the spread of COVID-19, infecting, and
potentially killing, many others."

     On May 18, 2020, the circuit court issued an order
granting plaintiffs' motion for a preliminary injunction. As
it explained in a letter opinion accompanying the order, the
court based its ruling on its understanding of the interplay
of the Governor's emergency powers under ORS chapters 401
and 433. The court concluded that ORS 401.165, which autho-
rizes the Governor to declare a state of emergency, and ORS
433.441, which authorizes the Governor to declare a public
health emergency, "are in conflict over the length of time the
Governor's orders last" because chapter 401 does not limit
the duration of a state of emergency to a specific number of
days, but chapter 433 limits the duration of a public health
emergency to 14 days, unless it is extended for an additional
14 days. After concluding that the statutes conflicted, the
court held that chapter 433 controls because "it is the more
specific statute[.]" Because several of the Governor's exec-
utive orders implement actions that chapter 433 expressly

---

[8] The fifth of the six declarations that plaintiffs sought refers to EO 20-12
"impinging" on plaintiffs' constitutional rights, but the explanation that follows—
that the order allows the Governor to impinge on those rights "even after [the]
duration of the state of emergency set forth in her orders is terminated"—
indicates that requested declaration is based on time limitations, rather than a
stand-alone violation of constitutionally protected religious freedoms.

authorizes, the court concluded that the orders were subject to the time limit in chapter 433, which the court concluded was a maximum of 28 days (the original 14 days, plus a single 14-day extension). Consequently, the court ruled that, once the maximum 28-day period had expired, EO 20-03 and all of the subsequent orders "were rendered null and void."

The circuit court, however, rejected plaintiffs' argument based on Article X-A, which allows the Governor to declare a catastrophic disaster. It explained that "the Governor was not required to invoke the provisions of Article X-A" because the article "clearly states that the Governor has discretion to implement the constitutional provisions because the Governor '*may* invoke the provisions of this Article.'" (Quoting Or Const, Art X-A, § 1(3) (emphasis added)). Thus, the court concluded that the Governor's executive orders were not subject to the 30-day time limit set out in Article X-A.

The circuit court then considered factors relevant to whether it should exercise its discretion to issue a preliminary injunction. First, the court concluded that, because plaintiffs had demonstrated that the Governor's executive orders had exceeded the 28-day time limit in ORS chapter 433, plaintiffs were likely to succeed on the merits of their claim. Then, the court concluded that plaintiffs and intervenors had shown that they would be irreparably harmed by enforcement of the orders, that the orders were not required for public safety, and that the public interest would be served by enjoining enforcement of the orders. Consequently, the court granted plaintiffs' motion for a preliminary injunction.

On the same day, the Governor filed a petition in this court, asking this court to issue either a peremptory writ of mandamus vacating the circuit court's preliminary injunction, or an alternative writ of mandamus ordering the circuit court either to vacate the preliminary injunction or to show cause why it was not required to do so. ORS 34.150. The Governor also filed a motion for an emergency stay of the circuit court's order during this mandamus proceeding, which this court granted.

After considering memoranda filed by plaintiffs and intervenors in opposition to the Governor's mandamus petition, this court issued an alternative writ of mandamus and allowed the parties to brief the issue of whether this court should issue a peremptory writ of mandamus. The circuit court chose to take no action regarding its disputed ruling, and this court has now received and reviewed the parties' briefs, as well as briefs from *amici curiae*.[9]

## II.   ANALYSIS

The question before this court is whether to issue a peremptory writ of mandamus ordering the circuit court to vacate the preliminary injunction. As mentioned, this court may order a circuit court to vacate a preliminary injunction if the injunction was based on a "fundamental legal error" or if the circuit court acted "outside the permissible range" of its discretion. *Keisling*, 317 Or at 623.

A.   *ORS chapters 401 and 433*

We begin with the question of whether the circuit court erred in concluding that the Governor's executive orders are subject to a 28-day time limit under ORS chapter 433. To resolve that question, we must interpret the statutes in ORS chapters 401 and 433 that relate to emergency declarations. When interpreting a statute, our task is to ascertain the intent of the legislature that enacted it. *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009); *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). To do so, we look first to the text of the statute, which is the best evidence of the legislature's intent. *Gaines*, 346 Or at 171. To inform our understanding of the text, we consider its context, which includes related statutes and the statutory framework within which the statute was enacted. *PGE*, 317 Or at 611; *Polacek and Polacek*, 349 Or 278, 284, 243 P3d 1190 (2010). In addition to the statute's text and context, we consider any relevant legislative history. *Gaines*, 346 Or at 171-72, 178.

---

[9] In this mandamus proceeding, the Governor is the "relator," and the plaintiffs and intervenors are the "adverse parties." ORS 34.105. For simplicity, we refer to the parties either by title or by their designation in the circuit court.

"[W]hen multiple statutory provisions are at issue in a case, this court, if possible, must construe those statutes in a manner that will give effect to all of them." *Powers v. Quigley*, 345 Or 432, 438, 198 P3d 919 (2008) (internal quotation marks omitted). We are to avoid a construction that creates a conflict or renders one statute ineffective. *Vaughn v. Pacific Northwest Bell Telephone*, 289 Or 73, 83, 611 P2d 281 (1980). Instead, the statutes "should be read together and harmonized, if possible." *Powers*, 345 Or at 438 (internal quotation marks omitted).

In the following sections, we review the statutes in ORS chapters 401 and 433 relating to emergency declarations and explain what powers they give the Governor, what limits they impose, and how they relate to each other.

1.   *ORS chapter 401*

We begin with the statutes in ORS chapter 401, specifically ORS 401.165 to 401.204. ORS 401.165(1) authorizes the Governor to declare "a state of emergency." Specifically, it provides, "The Governor may declare a state of emergency by proclamation * * * after determining that an emergency has occurred or is imminent." The proclamation must specify "the geographical area covered by the proclamation," and the area "shall be no larger than necessary to effectively respond to the emergency." ORS 401.165(5). For the purposes of chapter 401, "emergency" is defined by ORS 401.025(1) as "a human created or natural event or circumstance that causes or threatens widespread loss of life, injury to person or property, human suffering or financial loss, including but not limited to * * * disease[.]"[10] Thus, the legislature

---

[10]  In full, ORS 401.025(1) provides:

"'Emergency' means a human created or natural event or circumstance that causes or threatens widespread loss of life, injury to person or property, human suffering or financial loss, *including but not limited to*:

"(a)  Fire, explosion, flood, severe weather, landslides or mud slides, drought, earthquake, volcanic activity, tsunamis or other oceanic phenomena, spills or releases of oil or hazardous material as defined in ORS 466.605, contamination, utility or transportation emergencies, *disease*, blight, infestation, civil disturbance, riot, sabotage, acts of terrorism and war; and

"(b)  A rapid influx of individuals from outside this state, a rapid migration of individuals from one part of this state to another or a rapid displacement of

has expressly authorized the Governor to declare a state of emergency in response to a disease.

Under ORS chapter 401, the Governor has broad authority during a state of emergency. Of particular relevance here, ORS 401.168(1) provides that, during a state of emergency, the Governor has "the right to exercise, within the area designated in the proclamation, all police powers vested in the state by the Oregon Constitution in order to effectuate the purposes of this chapter."[11]

The term "police power" refers to "the whole sum of inherent sovereign power which the state possesses, and, within constitutional limitations, may exercise for the promotion of the order, safety, health, morals, and general welfare of the public." *Union Fishermen's Co. v. Shoemaker*, 98 Or 659, 674, 193 P 476 (1920). The police power "extends to all the great public needs[.]" *Christian et al. v. La Forge*, 194 Or 450, 467, 242 P2d 797 (1952) (internal quotation marks omitted). "Public health is, of course, one of the important factors giving rise to the exercise of the police power[.]" *State v. Hudson House, Inc. et al*, 231 Or 164, 172, 371 P2d 675 (1962). The state may exercise its police power in many ways, including through "[i]nspection laws, quarantine laws, [and] health laws of every description[.]" *State ex rel. v. Farmers Union Creamery*, 160 Or 205, 214, 84 P2d 471 (1938) (quoting *Nebbia v. New York*, 291 US 502, 510, 54 S Ct 505, 78 L Ed 940 (1934) (internal quotation marks and citation omitted)). As the United States Supreme Court held in *Jacobson*, 197 US at 25, when affirming a city regulation requiring residents to be vaccinated against smallpox, a state's police power includes the power to enact reasonable regulations for

---

individuals if the influx, migration or displacement results from the type of event or circumstance described in paragraph (a) of this subsection."

(Emphases added.) Thus, ORS 401.025(1) defines "emergency" and includes a nonexclusive list of examples of emergencies.

[11] ORS 401.168 also gives the Governor the authority to suspend any agency orders or rules if strict compliance with them "would in any way prevent, hinder, or delay mitigation of the effects of the emergency," "to direct any agencies in the state government to utilize and employ state personnel, equipment and facilities for the performance of any activities designed to prevent or alleviate actual or threatened damage due to the emergency," and "to provide supplemental services and equipment to local governments to restore any services in order to provide for the health and safety of the citizens of the affected area." ORS 401.168(2) - (3).

the protection of "the public health and the public safety." Through the police power, a community can "protect itself against an epidemic of disease which threatens the safety of its members." *Id*. at 27. Thus, through the enactment of ORS 401.168(1), the legislature has given the Governor authority to exercise the state's police powers during a state of emergency, and those powers include the power to regulate conduct for public health and safety.

Other statutes within ORS chapter 401 describe some of the actions that the Governor may take during a state of emergency. For example, ORS 401.175 specifies that the Governor may assume control of emergency operations and law enforcement activities, close roads and highways, designate persons to coordinate relief work, and require the aid of public or quasi-public agencies. As another example, ORS 401.188(2) authorizes the Governor to "issue, amend and enforce rules and orders" to "[p]rescribe and direct activities in connection with the use *** of materials, services and facilities, including *** health and medical care[,] *** education[,] *** and other essential civil needs."

Although they are broad, the Governor's emergency powers under ORS chapter 401 are not unlimited. To the contrary, they are limited both by statutes and by the state and federal constitutions.

The Governor's emergency powers under ORS chapter 401 are limited by statute in several ways. First, they are required to be exercised in a manner consistent with the reason for which they are granted; that is, they must be exercised to address the declared emergency. As quoted above, ORS 401.168(1) provides that the Governor can exercise the state's police powers "to effectuate the purposes of this chapter." Similarly, ORS 401.175(1), which authorizes the Governor to assume control over emergency operations, provides that the Governor may "do all things deemed advisable and necessary to alleviate the immediate conditions," and ORS 401.188(3) authorizes the Governor to take actions "that may be necessary for the management of resources following an emergency." Second, the Governor's emergency powers under chapter 401 may be exercised only during a declared state of emergency, which ORS 401.204(1) requires

the Governor to "terminate by proclamation when the emergency no longer exists, or when the threat of an emergency has passed." Third, the Governor's emergency powers are limited in that they can be terminated by the legislature. ORS 401.204(2) provides, "The state of emergency proclaimed by the Governor may be terminated at any time by joint resolution of the Legislative Assembly," which can convene itself to issue such a resolution. Or Const, Art IV, § 10a.[12]

In addition, the Governor's emergency powers under ORS chapter 401 are limited by the state and federal constitutions. Therefore, although the state's police powers include the power to impose reasonable public safety regulations, courts may intervene if the regulations exceed constitutional limits. As the Supreme Court observed in *Jacobson*,

> "[I]t might be that an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons."

197 US at 28.

Thus, when the Governor declares a state of emergency pursuant to ORS 401.165, the Governor has express authority to take the actions specified in ORS 401.165 to 401.236, subject to statutory and constitutional limits. In addition to those actions, the Governor also has express authority to take the actions specified in certain statutes in ORS chapter 433 relating to public health emergencies. That authority is found in ORS 433.441(4), which provides, "If a state of emergency is declared as authorized under ORS

---

[12] Article IV, section 10a, of the Oregon Constitution provides:

"In the event of an emergency the Legislative Assembly shall be convened by the presiding officers of both Houses at the Capitol of the State at times other than required by section 10 of this Article upon the written request of the majority of the members of each House to commence within five days after receipt of the minimum requisite number of requests."

*See also* ORS 171.015 (implementing Art IV, § 10a).

401.165, the Governor may implement any action authorized by ORS 433.441 to 433.452." Those actions include closing facilities, regulating goods and services, and, controlling or limiting "entry into, exit from, movement within, and the occupancy of premises in any public area subject to or threatened by a public health emergency" as reasonably necessary to respond to the emergency. ORS 433.441(3). They also include seeking assistance under the Emergency Management Assistance Compact. ORS 433.446.

The Governor's emergency powers under ORS chapter 401 are not limited to a specific number of days. Instead, they continue until the state of emergency is terminated. ORS 401.192(4) provides, "The powers granted to the Governor by ORS 401.165 to 401.236 shall continue until termination of the state of emergency." As mentioned, ORS 401.204(1) requires the Governor to issue a proclamation terminating the state of emergency when the emergency no longer exists or when the threat of emergency is passed, and ORS 401.204(2) provides that the legislature may terminate a state of emergency at any time by joint resolution.

The legislature has provided that the rules and orders that the Governor issues pursuant to her emergency authority under ORS chapter 401 "shall have the full force and effect of law both during and after the declaration of a state of emergency." ORS 401.192(1). The legislature has also expressly addressed how any conflict between the statutes in chapter 401 and any other laws, ordinances, rules, or orders should be resolved: the statutes in chapter 401 control. ORS 401.192(1) provides, "All existing laws, ordinances, rules and orders inconsistent with ORS 401.165 to 401.236 shall be inoperative during the period of time and to the extent such inconsistencies exist."

In sum, ORS 401.165 authorizes the Governor to declare a state of emergency in response to, among other things, a circumstance that threatens widespread loss of life, injury, or human suffering—specifically including disease. Through ORS 401.165 and related statutes, the legislature has given the Governor broad authority to act, including the authority to exercise all police powers vested in the state. Those powers include the power to regulate conduct in order

to protect the community "against an epidemic of disease which threatens the safety of its members." *Jacobson*, 197 US at 27. In addition to the actions specified in ORS chapter 401, the Governor may also implement any action authorized by ORS 433.441 to 433.452. The Governor's emergency powers continue until the termination of the state of emergency, either by the Governor or the legislature. If any of the statutes in chapter 401 relating to emergencies conflict with any other laws, ordinances, rules, and orders, then the statutes in chapter 401 control.

Thus, the ORS chapter 401 emergency statutes indicate that the Governor has the statutory authority to declare a state of emergency to respond to the coronavirus pandemic, which, in turn, enables her to take actions to protect public health, including restricting gatherings and requiring social distancing—pursuant to ORS 401.168(1) (granting police powers) and ORS 433.411(3) (authorizing control of movements). The chapter 401 emergency statutes also indicate that the Governor's authority to take those actions continues until either the Governor or the legislature terminates the state of emergency in the manner specified in ORS 401.204. As we explain in the following section, the ORS chapter 433 emergency statutes support that conclusion.

2.  *ORS chapter 433*

ORS chapter 433 concerns public health, and a series of statutes in that chapter concerns public health emergencies, ORS 433.441 to 433.452. One of those statutes, ORS 433.441, gives the Governor the authority to declare "a public health emergency." To do so, the Governor issues a proclamation, which must specify, among other things, the nature of the public health emergency and the political subdivision or geographic area subject to the proclamation. ORS 433.441(2).

Like the Governor's authority to declare a state of emergency under ORS chapter 401, the Governor's authority to declare a public health emergency under chapter 433 is discretionary. The Governor "may" declare such an emergency. ORS 401.165(1); ORS 433.441(1). The Governor is not

required to do so, even if the conditions justifying a declaration exist. When the Governor does declare a public health emergency, the Governor may make use of the emergency powers granted by ORS 433.441 to 433.452.

The statutes in ORS chapter 433 regarding public health emergencies were enacted to give the Governor an additional tool with which to respond to public health emergencies. They were not intended to prevent the Governor from declaring a state of emergency under chapter 401. That is clear from a statute in chapter 433 itself: ORS 433.441(4), which provides that "[n]othing in ORS 433.441 to 433.452 limits the authority of the Governor to declare a state of emergency under ORS 401.165." In addition, the powers granted by ORS 433.441 to 433.452 are not powers that may be used *only* during a public health emergency declared under ORS 433.441(1). ORS 433.441(4) expressly provides that the same powers may be used during a state of emergency declared under ORS 401.165: "If a state of emergency is declared as authorized under ORS 401.165, the Governor may implement any action authorized by ORS 433.441 to 433.452."

Thus, when faced with a public health emergency, the Governor may declare a state of emergency under ORS chapter 401 or a public health emergency under ORS chapter 433. Declaring a state of emergency under chapter 401 gives the Governor greater authority: it enables the Governor to take all the actions authorized by the emergency provisions in both chapters 401 and 433. By contrast, if the Governor declares a public health emergency under ORS 433.441, the Governor's emergency powers are more limited.

In addition, unlike an emergency declared under ORS 401.165, a "proclamation of a state of public health emergency expires * * * no more than 14 days after the date the public health emergency is proclaimed unless the Governor expressly extends the proclamation for an additional 14-day period." ORS 433.441(5). That durational limit is, by its express terms, a limit on the duration of a public health emergency declared under ORS 433.441. Nothing in the text of ORS 433.441 limits the duration of an emergency declared under chapter 401, nor does it limit the Governor's

use of chapter 433 powers during an emergency declared under chapter 401.

Another provision in ORS chapter 433 indicates that the legislature did not intend ORS 433.441(5) to limit the duration of a state of emergency declared under ORS chapter 401 or the Governor's use of chapter 433 powers during such an emergency. ORS 433.443(4)(a) provides that, during a public health emergency, the Public Health Director and local public health administrators may gather and use individually identifiable health information until the public health emergency expires *or* a related state of emergency declared under chapter 401 terminates. Specifically, ORS 433.443(4) provides:

"(a) During a declared state of public health emergency, the Public Health Director and local public health administrators shall be given immediate access to individually identifiable health information necessary to:

"(A) Determine the causes of an illness related to the public health emergency;

"(B) Identify persons at risk;

"(C) Identify patterns of transmission;

"(D) Provide treatment; and

"(E) Take steps to control the disease.

"* * * * *

"(d) Upon expiration of the state of public health emergency, the Public Health Director or local public health administrators may not use or disclose any individually identifiable health information that has been obtained under this section. *If a state of emergency that is related to the state of public health emergency has been declared under ORS 401.165, the Public Health Director and local public health administrators may continue to use any individually identifiable information obtained as provided in this section until termination of the state of emergency.*"

(Emphasis added.) Thus, ORS 433.443(4)(d) provides that the Public Health Director and local public health administrators can take actions to track and control the spread of a disease, and those actions can continue for more than

28 days, if the Governor declares a state of emergency under ORS 401.165. That, in turn, indicates that the legislature intended that a public health emergency under chapter 433 could coincide with or be followed by a state of emergency under chapter 401.

One of the reasons that the ORS chapter 433 emergency statutes were enacted was to give the Governor an option for responding to a public health emergency by taking a step short of declaring a state of emergency under chapter 401. The legislative history of the chapter 433 statutes, which we discuss next, makes that clear.

The original ORS chapter 433 emergency statutes were enacted in 2003, as a result of the passage of House Bill (HB) 2251. Or Laws 2003, ch 555. Dr. Grant Higginson, then the state Public Health Officer for the Department of Human Services (DHS), was the primary proponent of HB 2251,[13] which, among other things, authorized the Governor to declare a "state of impending public health crisis." HB 2251, § 1 (2003).[14]

When HB 2251 was before the Senate Human Resources Committee, Higginson explained to the committee that the Governor already had the power to declare a state of emergency under ORS 401.165. Audio Recording, Senate Committee on Human Resources, HB 2251, June 11, 2003, at 00:43:12 (statement of Dr. Grant Higginson), http://records.sos.state.or.us/ORSOSWebDrawer/Record/4179270# (accessed June 9, 2020); Testimony, Senate Committee on Human Resources, HB 2251, June 11, 2003, Ex G (statement

---

[13] *See* Testimony, Senate Committee on Human Resources, HB 2251, June 11, 2003, Ex G (statement of Dr. Grant Higginson).

[14] The phrase "impending public health crisis" was not defined in HB 2251. The bill did not distinguish between an impending crisis and an emergency. But the bill provided that "[t]he Governor may proclaim an impending public health crisis when there is a threat to public health that is 'imminent and likely to be widespread, life-threatening and of a scope that requires immediate medical action as authorized by sections 1 to 5 and 11' of [the bill]." Among other things, those sections authorized DHS to adopt reporting requirements to obtain information from health care providers, institutions, and facilities; create diagnostic and treatment protocols; order public health measures, including temporary isolation and quarantine; and impose civil penalties. HB 2251, § 1 - 5 (2003). As detailed below, 366 Or at 537-38, the phrase "state of impending public health crisis" was amended to "public health emergency" in 2007.

of Dr. Grant Higginson). But, as Higginson explained, some public health situations that require an immediate response might not be perceived as giving rise to the need for a declaration of a state of emergency under provisions like ORS 401.165. To illustrate that point, he referred to the anthrax attacks that followed the September 11, 2001, terrorist attacks. He noted that, "even during the height of the anthrax attacks, when over 30,000 people were being treated with prophylactic antibiotics and the national pharmaceutical stockpile was mobilized, no Governor made an emergency declaration." Testimony, Senate Committee on Human Resources, HB 2251, June 11, 2003, Ex G (statement of Dr. Grant Higginson). Passage of HB 2251, Higginson said, would give the state an "additional tool that is in proportion to the situation being faced" and, therefore, would be "more likely to be effectively used." *Id*. For example, in a situation similar to the anthrax attacks, it would enable DHS to impose reporting requirements or provide treatment guidance, without requiring the declaration of a state of emergency under ORS 401.165. *Id*.

In a later hearing before the House Health and Human Services Committee, Higginson explained that HB 2251 did not affect the Governor's ability to declare a state of emergency under ORS chapter 401. He walked legislators through the sections of the bill, pointing out that sections 1(1) and 1(2) authorized the Governor to proclaim a state of impending public health crisis in certain circumstances. Audio Recording, House Committee on Health and Human Services, HB 2251, Apr 30, 2003, at 00:00:45 (statement of Dr. Grant Higginson), http://records.sos.state. or.us/ORSOSWebDrawer/Record/4168693# (accessed June 9, 2020). He then described section 1(3), now codified as ORS 433.441(4), and he stated that the bill "in no way affects the Governor's ability to declare a state of emergency and that, in the case of a state of emergency, the Governor could do anything that's in this bill." *Id*. at 00:01:40.

Indeed, the provisions of HB 2251 were premised on the understanding that the proclamation of a state of impending public health crisis pursuant to section 1 of the bill, now codified as ORS 433.441, could be followed by

a declaration of a state of emergency under ORS chapter 401. The bill contained the provision, now codified at ORS 433.443(4)(d) and quoted above, that states that officials can take actions to track and control the spread of a disease and that those actions can continue for more than 28 days, if the Governor declares a state of emergency under ORS 401.165. HB 2251, § 23.

Thus, the emergency provisions set out in HB 2251 were intended to give the Governor an additional option for responding to an impending public health crisis, particularly one that is more limited in scope. Accordingly, HB 2251 included a durational limit on the proclamation of a state of impending public health crisis. It provided that such a proclamation "expires when terminated by a declaration of the Governor or no more than 14 days after the date it is proclaimed unless the proclamation is expressly extended for an additional 14-day period." HB 2251, § 1(4).

But that time limit, which is now codified as ORS 433.441(5), was not intended to apply to the Governor's declaration of a state of emergency under ORS chapter 401 or any other law. As one of the proponents of HB 2251 explained to the Senate Human Resources Committee, a proclamation under HB 2251 could coincide with, or be followed by, a declaration of a state of emergency by the Governor, which gives the Governor "much broader" powers. Audio Recording, Senate Committee on Human Resources, HB 2251, June 11, 2003, at 00:51:47 (statements of Scott Gallant), http://records.sos.state.or.us/ORSOSWebDrawer/Record/4179270# (accessed June 9, 2020). Thus, the legislature intended HB 2251 to provide an optional step that the Governor can take before declaring a "full-blown" state of emergency in response to a public health emergency. *Id.* at 00:40:45 (statements of Dr. Grant Higginson).

In 2007, the legislature amended the ORS chapter 433 emergency provisions, through HB 2185 (2007). Or Laws 2007, ch 445. HB 2185 served several purposes. One purpose was to update the terms and phrases used in chapter 433. Dr. Susan Allan, the Public Health Director of DHS, was the primary proponent of HB 2185. Testimony, Joint Committee on Emergency Preparedness and Ocean

Policy, HB 2185, Apr 24, 2007, Ex G (statement of Dr. Susan Allan). In testimony in support of the bill before the Joint Emergency Preparedness and Ocean Policy Committee, she explained that the then-existing public health statutes used a variety of terms and phrases, and that, to eliminate confusion, the drafters of HB 2185 had tried to use terms and phrases that were consistent with those used in model acts and by other jurisdictions. Audio Recording, Joint Committee on Emergency Preparedness and Ocean Policy, HB 2185, Mar 2, 2007, at 00:19:30 (statement by Dr. Susan Allen) http://records.sos.state.or.us/ORSOSWebDrawer/Record/4215506# (accessed June 9, 2020). One of the updates was to change the phrase "impending public health crisis" to "public health emergency." HB 2185, § 1. Consequently, upon the passage of HB 2285, ORS 433.441(1) was amended to provide, as it does today, "Upon the occurrence of a public health emergency, the Governor may declare a state of public health emergency as authorized by ORS 433.441 to 433.452."

Another purpose of HB 2185 was to establish, by statute, the position of the state Public Health Director. HB 2185, § 1; Exhibit B, Joint Committee on Emergency Preparedness and Ocean Policy, HB 2185, Mar 2, 2007 (summary of HB 2185 submitted by DHS). As a result of the creation of that position, the statutes that had provided that DHS could take certain actions were amended to provide that the Public Health Director could take those actions. *E.g.*, HB 2185, § 24. A related purpose of HB 2185 was to clarify the authority of the Public Health Director. Accordingly, the bill specified actions that the director could take with, and without, a declaration by the Governor. HB 2185, § 5; HB 2185, § 24.

HB 2185 also specified actions that the Governor could take during a declared public health emergency. It provided that the Governor could, among other things,

"Close, order the evacuation of or the decontamination of any facility the Governor has reasonable cause to believe may endanger public health * * *

"* * * * *

"Control or limit entry into, exit from, movement within and the occupancy of premises in any public area subject to or threatened by a public health emergency if such actions are reasonable and necessary to respond to the public health emergency."

HB 2185, § 23. In doing so, the bill expanded the actions that the Governor could take upon declaring a public health emergency under ORS chapter 433, but did not take the further step of declaring an emergency under chapter 401.

Notably, HB 2185 did not alter ORS 433.441, which states, "Nothing in ORS 433.441 to 433.452 limits that authority of the Governor to declare a state of emergency under ORS 401.055. If a state of emergency is declared as authorized under ORS 401.055, the Governor may implement any action authorized by ORS 433.441 to 433.452." Thus, the 2007 amendments are consistent with the view that, although the Governor may respond to a public health situation that meets the definition of "public health emergency" under ORS 433.442 by making a declaration under chapter 433, which gives rise to certain specified powers, the Governor may also respond to such an emergency by making a declaration under chapter 401, which gives rise to greater powers, if the public health emergency also meets the definition of "emergency" under ORS 401.025.

In her testimony about HB 2185, when asked about the Governor's power to respond to an emergency, Allan explained—as Higginson had in 2003—that the Governor could exercise emergency powers under ORS chapter 401. Audio Recording, Joint Committee on Emergency Preparedness and Ocean Policy, HB 2185, Apr 24, 2007, at 1:29:00 (statement by Dr. Susan Allen), http://records.sos.stte.or.us/ORSOSWebDrawer/Record/4215639# (accessed June 9, 2020). Specifically, she explained that the Governor has "general emergency powers" pursuant to which the Governor "can do a lot of things in an emergency." *Id*. She clarified that those powers "have nothing to do with" HB 2185. *Id*. She further clarified that, when exercising those powers, it was possible that the Governor could "take control over whatever might seem to be necessary in an emergency" and that HB 2185 did not "erase that power." *Id*.

To summarize: The legislature enacted the original ORS chapter 433 emergency statutes in 2003 to give the Governor "an additional tool" to respond to public health emergencies. Those statutes enable the Governor to exercise certain emergency powers as an alternative to declaring a "full blown" state of emergency under ORS chapter 401. Audio Recording, Senate Committee on Human Resources, HB 2251, June 11, 2003, at 00:40:45 (statement of Dr. Grant Higginson), http://records.sos.state.or.us/ORSOSWebDrawer/Record/4179270# (accessed June 9, 2020). Those statutes were not, however, intended to limit the Governor's authority under ORS chapter 401. Indeed, chapter 433 expressly provides, "Nothing in ORS 433.441 to 433.452 limits that authority of the Governor to declare a state of emergency under ORS 401.055. If a state of emergency is declared as authorized under ORS 401.055, the Governor may implement any action authorized by ORS 433.441 to 433.452." ORS 433.441(4).

If the Governor proclaims a public health emergency pursuant to ORS chapter 433, "the "proclamation *** expires" no more than 28 days after the emergency is proclaimed. Nothing in the terms of the 28-day time limit indicates that it applies to a state of emergency under ORS chapter 401. To the contrary, the statutes in chapter 433 and their legislative history show that the 28-day time limit was not intended to apply to a state of emergency under chapter 401.[15] *See, e.g.*, ORS 433.443(4)(d).

Thus, the ORS chapter 401 and chapter 433 emergency provisions do not conflict. Instead, they are compatible. They were intended to work, and do work, together.

3.   *The circuit court's ruling regarding ORS chapters 401 and 433*

As recounted above, in the civil action that underlies this mandamus proceeding, the circuit court concluded that the Governor's executive orders violated the 28-day

---

[15] This case does not present the question whether, if the Governor declares a public health emergency pursuant to ORS chapter 433, the Governor can issue a second declaration pursuant to that chapter after the first expires. Consequently, we need not, and do not, address that question.

time limit in ORS chapter 433. But, for the reasons just explained, that conclusion was incorrect. The Governor declared a state of emergency pursuant to ORS 401.165. That declaration gave the Governor broad authority, including the authority to exercise "all police powers vested in the state by the Oregon Constitution." ORS 401.168(1). And, those powers are not subject to the 28-day time limit.

Moreover, the Governor's emergency powers under ORS chapter 401 include the power to "implement any action authorized by ORS 433.441 to 433.452." ORS 433.441(4). Therefore, in exercising her authority pursuant to the declaration of the state of emergency under chapter 401, the Governor could order actions specified in chapter 433. Ordering those actions did not convert the Governor's chapter 401 declaration into a chapter 433 declaration, and it did not make the executive orders subject to the 28-day time limit. Chapter 433 does not limit the Governor's authority under chapter 401.

Thus, the circuit court's issuance of the preliminary injunction was based on a fundamental legal error. The court concluded that the Governor's executive orders had violated the 28-day time limit and, therefore, that plaintiffs were likely to succeed on the merits of their requests for declaratory judgment and injunctive relief. That was an erroneous legal conclusion.

B.   *Plaintiffs' and Intervenors' Alternative Arguments*

Before closing, we address two alternative arguments that plaintiffs and intervenors raise in this court, one of which the circuit court expressly rejected and the other of which it did not address.

1.   *Article X-A, section 6(1)*

In the circuit court, plaintiffs argued that the Governor's executive orders are subject to a 30-day limit under Article X-A, section 6(1), of the Oregon Constitution, and were null and void because that 30-day time period had expired. The circuit court rejected that argument, and, to the extent that plaintiffs are raising it in this court, we also reject it.

The Governor issued the executive orders pursuant to ORS chapter 401, and Article X-A has no bearing on the Governor's authority to exercise her emergency powers under chapter 401. Article X-A was intended to supplement, not supplant, the Governor's emergency powers under chapter 401. As its text and legislative history show, the purpose of Article X-A is to give the Governor the option of invoking additional emergency powers in the event of a catastrophic disaster.

As the circuit court noted, the Governor is not required to invoke her emergency powers under Article X-A, even if the circumstances would justify such an invocation. The terms of Article X-A itself make that clear. Article X-A provides that the Governor "*may* invoke the provisions of this Article if the Governor finds and declares that a catastrophic disaster has occurred." *Id.* § 1(3) (emphasis added). Thus, invocation of the emergency powers set out in Article X-A is discretionary.

For the purposes of Article X-A, a "catastrophic disaster" is "a natural or human-caused event that: (a) [r]esults in extraordinary levels of death, injury, property damage or disruption of daily life in this state; and (b) [s]everely affects the population, infrastructure, environment, economy, or government functioning of this state." *Id*. § 1(1). It includes, but is not limited to, events that meet those two requirements and are caused by earthquakes, tsunamis, public health emergencies, and acts of terrorism. *Id*. § 1(2). Circumstances that constitute an emergency for the purposes of ORS chapter 401 may not rise to the level of a "catastrophic disaster." But even if they do, the Governor is not required to invoke Article X-A to address them.

The powers granted by Article X-A are extraordinary, and the Governor may reasonably decline to invoke them. The emergency powers that arise from a declaration of a catastrophic disaster pursuant to Article X-A far exceed those that arise from a declaration of a state of emergency pursuant to ORS chapter 401. A declaration of a catastrophic disaster pursuant to Article X-A enables the Governor and the Legislative Assembly to override more

than 10 other state constitutional provisions. Among other things, it enables the Governor to use moneys for purposes other than those for which the legislature appropriated or allocated them. *Id*. § 2. It also reduces the number of legislators required to constitute a quorum and pass a bill. *Id*. §§ 3(2), (4). In addition, it authorizes the legislature to enact laws to use highway fund moneys for any purpose, spend moneys that would otherwise go to tax refunds, and exceed the state debt limit. *Id*. §§ 4(1)(a), (b), (c). Those powers and others are set out in sections 1 to 5 of Article X-A. Given their extraordinary nature, they are appropriately time-limited by section 6(1) of Article X-A, which provides that "the provisions of sections 1 to 5 of this Article, once invoked, shall cease to be operative not later than 30 days following the date the Governor invoked the provisions of sections 1 to 5," unless the legislature extends the operation of those sections prior to the expiration of the 30-day period. *Id*. §§ 6(1), (2).

In sum, by its terms, Article X-A gives the Governor the option of invoking extraordinary powers in response to a catastrophic disaster and limits the time period during which those powers can be exercised, unless they are extended by the legislature. Nothing in the text of the Article X-A indicates that any part of Article X-A is intended to apply if the Governor does not declare a catastrophic disaster or invoke those extraordinary powers. To the contrary, the time limit is keyed to the invocation of the specific powers set out in sections 1 to 5 of the Article itself. Therefore, the text of the Article X-A establishes that its 30-day time limit applies to, and only to, the extraordinary powers described in sections 1 to 5 of Article X-A.

The legislative history of Article X-A confirms that conclusion. Article X-A was added to the constitution as a result of the voters' approval of Ballot Measure 77 (2012), which the legislature referred to them through House Joint Resolution 7 in 2011. The ballot title for the measure highlighted that the measure would give the Governor discretionary authority to invoke powers that would override constitutional limits. The caption of the title described the major effects of the measure as follows:

> "Amends Constitution: Governor may declare 'catastrophic disaster' (defined); requires legislative session; authorizes suspending specified constitutional spending restrictions."

Official Voters' Pamphlet, Marion County, General Election, Nov 6, 2012, 42. In addition, the summary of the measure explained that the Governor already had *statutory* emergency powers and that the measure would give the Governor *constitutional* emergency powers. The summary—which is statutorily limited to a specified number of words and, as a result, is terse—begins:

> "Amends Constitution. Currently, Governor has statutory, but not constitutional, authority to declare state of emergency and direct response to emergency. Measure grants Governor constitutional authority to declare and respond to natural or human-caused 'catastrophic disaster' (defined)."

*Id*. Similarly, the explanatory statement for the measure stated that a declaration of a catastrophic disaster would grant the Governor and the legislature "new temporary powers not available under certain constitutional provisions and statutes[.]" *Id*. at 45. Thus, the information provided to voters conveyed that the measure enabled the Governor to invoke new constitutional powers in addition to her existing statutory powers. Nothing indicated that the measure would limit the Governor's statutory powers.

In sum, like its text, the legislative history of Article X-A shows that the article was intended to give the Governor an additional, separate tool for responding to certain types of emergencies. It was not intended to limit the Governor's authority under ORS chapter 401 or impose a time limit on the Governor's exercise of that authority.

In this case, plaintiffs acknowledge that the Governor's orders do not mention Article X-A, and they do not contend that the Governor has attempted to exercise any of the extraordinary emergency powers under sections 1 to 5 of Article X-A. Nevertheless, they contend that the Governor's order is subject to the 30-day limit of section 6(1) of Article X-A. As we understand it, plaintiffs' position is that, any time that the Governor declares a state of emergency pursuant to ORS chapter 401 in response to circumstances that meet the criteria for a catastrophic disaster, the

Governor should be deemed to have declared a catastrophic disaster pursuant to Article X-A. That is incorrect. Chapter 401 and Article X-A authorize separate, discretionary declarations, which give rise to different emergency powers that are subject to different limits, including different time limits. As explained above, by its terms, the 30-day limit in section 6 of Article X-A applies to, and only to, invocations of the provisions of sections 1 to 5 of Article X-A. It does not apply to a declaration of emergency under chapter 401, like the declaration in EO 20-03.

Intervenors make a different argument regarding Article X-A. They contend that, because Article X-A includes a 30-day limit for catastrophic disasters, ORS chapter 401 must include one for states of emergency, asserting that the constitutional amendment indicates an "intent to place a time limit on the Governor's extraordinary police powers when addressing emergencies such as catastrophic disasters and public health emergencies." That argument is unavailing, because it fails to recognize the substantial difference between the emergency powers under Article X-A—which override basic constitutional limits on passing laws and spending moneys—and the emergency powers under chapter 401.

2. *Freedom of religion*

Plaintiffs' arguments before the circuit court and before this court have focused primarily on the idea that the Governor's executive orders have expired and, therefore, are null and void. However, before this court, they have also argued that the orders violate their state constitutional right to freely exercise their religion. In response, the Governor argues that that argument is not properly before this court because plaintiffs did not assert it in their complaint.

As detailed above, plaintiffs' complaint claims that the Governor's executive orders violated state statutory and constitutional time limits, and it seeks six declarations, each of which is based on the theory that the orders had expired. 366 Or at 521. In keeping with that theory, plaintiffs asked the circuit court to enjoin all of the orders, not only those that they contend affect their religious liberties.

Plaintiffs *did* argue that the orders affected their religious practices, but they did so in connection with their argument about other factors that courts consider when determining whether to issue a preliminary injunction, specifically, whether the party requesting the injunction will be irreparably harmed if the injunction is not issued and, if so, how the harm to that party compares to any harm that would be suffered by the other party and the public if the injunction is issued. In other words, plaintiffs did not assert a stand-alone free-exercise claim that the Governor's orders were invalid because they violate constitutionally protected religious freedoms. Moreover, plaintiffs did not base their preliminary injunction request on such a theory, as evidenced by the breadth of their request. And such a theory would not justify the preliminary injunction that the circuit court issued, which applies to all the Governor's coronavirus orders. It is not limited to those that, for example, limit the size of gatherings or close schools. Accordingly, we do not address that theory.[16]

## III.  CONCLUSION

As noted at the outset, this case is before this court for a determination whether the circuit court erred in issuing a preliminary injunction based on its conclusion that the Governor's executive orders relating to the coronavirus violated a statutory time limit, specifically, the 28-day time limit in ORS chapter 433. As we have explained, the

---

[16] Furthermore, to prevail on such a theory, plaintiffs would have to prove that the Governor's executive orders violate their right to freely exercise of religious opinions, and it is well established under both the First Amendment's Free Exercise Clause and Article I, sections 2 and 3, of the Oregon Constitution that a regulation can affect a person's exercise of their religion without violating those provisions. *See, e.g.*, *Prince v. Massachusetts*, 321 US 158, 166-67, 64 S Ct 438, 88 L Ed 645 (1944) ("The right to practice religion freely does not include liberty to expose the community *** to communicable disease[.]"). Again, as Chief Justice Roberts stated recently, "The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement *** and when [state officials] 'undertake to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *South Bay United Pentecostal Church*, 2020 WL 2813056 at 1, (Roberts, C.J., concurring) (quoting *Marshall v. United States*, 414 US 417, 427, 94 S Ct 700, 38 L Ed 2d 618 (1974)). "That is especially true where, as here, a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground." 2020 WL 2813056 at 1.

Governor's orders were issued pursuant to ORS chapter 401, and they are not subject to the time limit in chapter 433. Therefore, the circuit court's preliminary injunction was based on a legal error. Moreover, plaintiffs' alternative arguments do not provide a basis for maintaining the preliminary injunction. Accordingly, it is necessary to vacate the preliminary injunction.

Peremptory writ of mandamus to issue immediately, in terms consistent with this opinion.

**GARRETT, J.,** concurring in the judgment.

The majority opinion thoroughly lays out some problems with the interpretation of ORS chapters 401 and 433 that plaintiffs and intervenors have urged and that the circuit court adopted in issuing the preliminary injunction. But, in my view, the majority goes farther than is needed to resolve this mandamus petition. It is not necessary in this posture to fully answer the complicated question of how the various emergency powers were intended to operate. For purposes of deciding whether the circuit court acted permissibly in granting the extraordinary remedy of preliminary injunctive relief, it is sufficient to conclude that plaintiffs have failed to demonstrate a likelihood of success on the merits—for the reasons that the majority opinion ably demonstrates—and that the other factors that a court must consider in deciding whether to issue a preliminary injunction do not weigh in plaintiffs' favor. Thus, although I reach the same result as the majority, I do so for a different reason: the circuit court's order exceeded the permissible range of its discretion. That conclusion is compelled by well-settled equitable principles that can be readily applied here without a need to definitively resolve, in this expedited proceeding, the meaning of numerous statutory and constitutional provisions.

A circuit court has the discretion to issue a preliminary injunction. ORCP 79 A, C. The circuit court exercised that discretion in this case by applying the traditional equitable standards for issuing a preliminary injunction. There is no dispute about what those standards are; rather the parties disagree as to their correct application. Under

Oregon law, an injunction, whether preliminary or permanent in nature, "is an extraordinary remedy and will be granted only upon clear and convincing proof." *Jewett v. Deerhorn Enterprises, Inc.*, 281 Or 469, 473, 575 P2d 164 (1978); *see also Wilson v. Parent*, 228 Or 354, 370, 365 P2d 72 (1961) (same). That is consistent with federal case law that similarly applies common-law standards for granting a preliminary injunction. *See Winter v. Natural Resources Defense Council, Inc.*, 555 US 7, 22, 129 S Ct 365, 172 L Ed 2d 249 (2008) (stating that preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief"); *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 US 308, 318-19, 119 S Ct 1961, 144 L Ed 2d 319 (1999) (noting that granting a preliminary injunction "depend[s] on traditional principles of equity jurisdiction" (internal citation and quotation marks omitted)).

Traditionally, courts in equity have considered four factors to determine whether to grant or deny a preliminary injunction: (1) whether the plaintiff might suffer irreparable harm without an injunction; (2) the balance of equities, hardships, and conveniences between the parties; (3) whether the public interest weighs for or against an injunction; and (4) the plaintiff's likelihood of success on the merits. *See Winter*, 555 US at 20 (describing traditional equity standards); *Injunctions*, 42 Am Jur 2d § 15 (same).

Our case law on the standards for preliminary injunctions is not well developed. The case law that we do have expressly recognizes the first three factors. *See State of Oregon ex rel. v. Dobson*, 195 Or 533, 580, 245 P2d 903 (1952) (showing of irreparable harm required) (citing *Injunctions*, 28 Am Jur § 14); *State ex rel. v. Duncan*, 191 Or 475, 500, 230 P2d 773 (1951) (court must balance hardships and "conveniences"); *Bennett v. City of Salem et al.*, 192 Or 531, 546, 235 P2d 772 (1951) ("[T]here are situations where the public interest would be so seriously affected by the issuance of an injunction that the court will deny an application therefor.").

In its limited case law, this court has not had the occasion to consider the fourth factor, the likelihood of success on the merits. But this court also has never indicated

an intent to depart from the traditional factors, including the likelihood of success—a factor so well-established as to be axiomatic. *See Winter*, 555 US at 20 (recognizing that the plaintiff's likelihood of success on the merits is a preliminary injunction factor); John Leubsdorf, *The Standard for Preliminary Injunctions*, 91 Harv L Rev 525, 527 (1978) (noting that 18th-century English courts in equity frequently considered "the strength of the plaintiff's case"); *see also* James L. High, 1 *A Treatise on the Law of Injunctions*, § 5 (3d ed 1890) ("The court will not, however, upon an application for an interlocutory injunction, shut its eyes to the question of the probability of plaintiff ultimately establishing his demand, nor will it by injunction disturb defendant in the exercise of a legal right without a probability that plaintiff may finally maintain his right as against that of the defendant."). As a result, the circuit court did not err in considering the likelihood of success on the merits, and the parties have not argued otherwise.

Contrary to the circuit court's conclusion, however, none of the relevant factors favors the grant of extraordinary preliminary injunctive relief. First and foremost, plaintiffs have not demonstrated a likelihood of prevailing on their statutory arguments. Where I part company with the majority is that I would stop short of concluding, at this stage, that plaintiffs *cannot* prevail on those arguments; it is enough to say that their arguments to this point fall short of what is required for preliminary injunctive relief. *See American Life Ins. v. Ferguson*, 66 Or 417, 420, 134 P 1029 (1913) ("[A court] should merely recognize that a sufficient case has been or has not been made to warrant the preservation of the property or rights *in statu quo* until the hearing on the merits, without expressing a final opinion as to such right."); *Helm et al. v. Gilroy et al.*, 20 Or 517, 520, 26 P 851 (1891) (same) (citing High, *A Treatise on the Law of Injunctions*, §§ 4, 5).

In light of all that, the question toward which the circuit court's discretion should have been directed is this: Is the irreparable harm that plaintiffs will suffer if the Governor's executive orders are not immediately enjoined so compelling, when balanced against the harm to their

opponent and the public interest if the orders *are* enjoined, that plaintiffs should not be required to await the outcome of their action to see if they are entitled to that relief— particularly when they have not made a strong showing that they will be?

Framing the issue in that way does not minimize the harms that plaintiffs and intervenors are claiming will flow from the continued operation of the Governor's executive orders, nor does it deny that those harms are irreparable. The inability of plaintiffs to worship in the manner that they prefer and the inability of intervenors to carry on their businesses in the manner that is usual (or at all) is irreparable harm for these purposes, even if temporary. But, in these circumstances, the harm to their opponents and the public must also be considered, and considered in the light that, in the seemingly likely event that plaintiffs will lose, that harm will have been suffered needlessly.

In cases involving competing private interests, consideration of the "public interest" factor may play little or no role. In this case, it predominates. The Governor is defending not her personal interests, but her considered understanding of the public interest. Her executive orders, as plaintiffs acknowledge, are directed at protecting the public. As the Governor of Oregon, she is uniquely situated, and duty-bound, to protect the public in emergency situations and to determine, in such emergencies, where the public interest lies. The challenged orders were issued in performance of those duties, based on consideration of the range of dangers that different Oregonians may face from COVID-19, the scientific evidence that is available to her regarding how best to contain the disease, and the strong interests of Oregonians in maintaining their religious practices and businesses but also in protecting themselves and their loved ones.

As Chief Justice Roberts observed days ago, "The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. *** When [state] officials 'undertake to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *South Bay United*

*Pentecostal Church v. Newsom*, No. 19A1044, 590 US ___, ___, 2020 WL 2813056 at \*1 (May 29, 2020) (Roberts, C. J., concurring) (quoting *Marshall v. United States*, 414 US 417, 427, 94 S Ct 700, 38 L Ed 2d 618 (1974)). Notably, "[i]t is no part of the function of a court \*\*\* to determine which of two modes is likely to be the most effective for the protection of the public against disease." *Jacobson v. Massachusetts*, 197 US 11, 30, 25 S Ct 358, 49 L Ed 643 (1905). "That is especially where, as here, a party seeks emergency relief \*\*\* while local officials are actively shaping their response to changing facts on the ground." *South Bay United Pentecostal Church*, 2020 WL 2813056 at \*2.

In determining that the Governor's executive orders should be enjoined, the circuit court did not give sufficient attention to the Governor's role, in emergency situations such as the COVID-19 pandemic, in determining what is in the public interest, and it did not give the necessary weight to the harm to that public interest, as delineated by the state's elected executive, that would result if her orders were enjoined. The circuit court's error in that regard is compounded by the likelihood that such harm to the public interest will be suffered needlessly, given that plaintiffs have not demonstrated that they are likely to prevail on the merits. For all those reasons, the issuance of the preliminary injunction was outside the permissible range of the circuit court's discretion.

Balmer, J., joins in this opinion concurring in the judgment.